Stuart R. MEYERS, Plaintiff–Appellant,

v.

**BROOKS SHOE INC. and Wolverine World Wide, Inc.,
Defendants–Appellees.**

No. 90–1081.

United States Court of Appeals,
Federal Circuit.

Aug. 31, 1990.

**1460**

Robert C. Faber, Ostrolenk, Faber, Gerb & Soffen, New York City, argued for plaintiff-appellant. With him on the brief were Samuel H. Weiner, Steven I. Weisburd and William O. Gray, III.

Terence J. Linn, Price, Heneveld, Cooper, Dewitt & Litton, Grand Rapids, Mich., argued for defendants-appellees. With him on the brief was Richard C. Cooper.

Before ARCHER and MAYER, Circuit Judges, and WEIGEL, Senior District Judge.*

* Stanley Weigel, Senior District Judge, United States District Court for the Northern District of California, sitting by designation.

OPINION

MAYER, Circuit Judge.

Stuart R. Meyers appeals an order of the United States District Court for the Southern District of New York, 721 F.Supp. 588 (1989), granting summary judgment for Brooks Shoe Inc. and Wolverine World Wide, Inc. on their defenses of laches and equitable estoppel to Meyers' suit for patent infringement. We reverse and remand.

## Background

Meyers is a practicing podiatrist interested in the biomechanics of running. He has independently developed therapeutic sole structures for running shoes and obtained patents for his inventions, including U.S. Patents 4,297,797, 4,445,283 and 4,627,177, issued November 3, 1981, May 1, 1984 and December 9, 1986, respectively.

Beginning in 1983, Meyers contacted various shoe manufacturers, including Brooks Shoe Inc. and Wolverine World Wide, Inc. (Brooks),[1] in an effort to commercialize his inventions. In a letter to Brooks dated November 9, 1983, referring to earlier telephone conversations with Brooks' general counsel, Meyers offered to negotiate licenses under his '797 patent, corresponding Canadian, Japanese and European patents, application no. 196,020 (which was a divisional of the '797 patent and issued as Meyers' '283 patent), and two continuation-in-part applications. Brooks' general counsel responded in a letter dated December 7, 1983 that Brooks was not interested in a license.

On November 2, 1987, Meyers filed an infringement suit based on his '797, '283 and '177 patents against various athletic shoe retailers, alleging that Brooks' CHARIOT running shoe infringed his '797 and '283 patents. The defendant retailers notified Brooks of the suit, and Brooks' outside counsel defended them.

1. In 1981, Wolverine World Wide, Inc. acquired the assets in bankruptcy of Turner Shoe Company, Inc., d/b/a Brooks Shoe Inc.

Meyers filed the present suit against Brooks on June 2, 1988, alleging that it made, used and/or sold shoes that fell within the scope of each of the '797, '283 and '177 patents. The case was transferred to the Southern District of New York and consolidated with similar suits against two other shoe manufacturers pursuant to 28 U.S.C. § 1407. On May 30, 1989, Brooks moved for summary judgment on the defenses of laches and equitable estoppel, and Meyers filed a cross-motion.

The district court granted Brooks' motion. The court wrote that Meyers first became aware of Brooks' alleged infringement in late 1982 or early 1983 and that Meyers contacted Brooks' general counsel by telephone in August 1983 and notified her of the alleged infringement. According to the court, between 1983 and 1987 Brooks expended a great deal of money and effort developing new shoes which included the allegedly infringing sole structure. The court rejected Meyers' contention that he could not have brought suit until the third patent issued and found that laches ran from late 1982 or early 1983 until 1988 when Meyers filed suit against Brooks, some five years. It held that Brooks had shown that Meyers had unreasonably and inexcusably delayed causing material prejudice, and that Meyers' silence following his "aggressive assertion" of infringement was so misleading as to amount to bad faith, resulting in equitable estoppel.

## Discussion

The question before us is whether the district court erred in concluding that there is no genuine issue as to any material fact and that Brooks was entitled to judgment as a matter of law. Fed.R.Civ.Proc. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1548, 5 USPQ2d 1779, 1782 (Fed.Cir.1988). The purpose of Rule 56 is to avoid an unnecessary trial, but it must be used carefully because an improper grant of summary judgment "may deny a party a chance to prove a worthy case." *Lemelson v. TRW, Inc.*, 760 F.2d 1254, 1260, 225 USPQ 697,

700 (Fed.Cir.1983) (quoting *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146, 219 USPQ 13, 15 (Fed.Cir.1983)). The district court cannot engage in fact-finding on a motion for summary judgment. *Id.* at 1260, 225 USPQ at 701. If there is a real dispute about a material fact or factual inference, summary judgment is inappropriate; the factual dispute should be reserved for trial. The moving party has the burden to demonstrate the absence of any genuine issue over all the material facts. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). And where the moving party has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense.

To establish laches, the defendant must show 1) unreasonable and inexcusable delay in filing suit and 2) material prejudice resulting from the delay. *Jamesbury*, 839 F.2d at 1551, 5 USPQ2d at 1785; *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1572, 4 USPQ2d 1939, 1940 (Fed.Cir.1987). Laches is presumed in patent infringement cases if the delay is longer than six years, but otherwise the defendant has the burden of proving both elements of the defense. Laches bars recovery of damages for any infringement occurring before suit was filed.

For the related defense of equitable estoppel, the defendant must show both elements of laches as well as 3) affirmative conduct by the patent owner inducing the belief that he had abandoned the claims against the alleged infringer and 4) detrimental reliance by the alleged infringer. *Jamesbury*, 839 F.2d at 1553, 5 USPQ2d at 1786; *Hottel*, 833 F.2d at 1573, 4 USPQ2d at 1941. Equitable estoppel bars all relief for patent infringement.

The district court should not have granted summary judgment on the laches defense because Brooks did not present undisputed facts showing that Meyers' delay in filing suit was unreasonable and that Brooks was prejudiced by the delay. Brooks was not entitled to judgment on its

defense of equitable estoppel either, not only because it failed to show unreasonable delay and prejudice, but also because a mere verbal charge of infringement, if made, followed by silence was not sufficient affirmative conduct to induce a belief that Meyers had abandoned an infringement claim.

In determining laches, the court must consider when the patent owner knew or should have known of the defendant's alleged infringement. *Jamesbury,* 839 F.2d at 1552, 5 USPQ2d at 1785. But, like infringement, laches does not begin until the patent issues. *Bott v. Four Star Corp.,* 807 F.2d 1567, 1575, 1 USPQ2d 1210, 1216 (Fed.Cir.1986). And where the plaintiff alleges infringement of more than one patent, laches must be determined separately for each. *Id.* at 1575, 1 USPQ2d at 1216.

We agree that Meyers did not raise a genuine issue of material fact about when he first believed Brooks' shoes infringed his '797 patent. He tells us in the brief that he did not have a patent attorney examine any of Brooks' products to determine whether they infringed until November of 1983, but he cites nothing in the record in support. Moreover, Meyers testified in his deposition that he was aware of Brooks' CHARIOT, the first of the allegedly infringing shoes, shortly after it hit the market, which was in September 1982, and that he then believed it incorporated his invention. We also do not agree with Meyers that filing suit against the retailers tolled the laches period. He did not give Brooks notice of the retailer litigation nor of his intent to enforce his patents against Brooks when it was concluded. That is necessary if delay is to be excused because of other litigation. *Jamesbury,* 839 F.2d at 1553, 5 USPQ2d at 1786; *Hottel,* 833 F.2d at 1573, 4 USPQ2d at 1940.

Nevertheless, we think the district court erred in basing its decision on a single laches period for all three patents, running from late 1982 or early 1983 to June of 1988. Meyers could not have filed suit on his second patent (the '283 patent) until after it issued in May 1984. Likewise,

he could not have filed suit on his third patent (the '177 patent) until after it issued in December 1986. Therefore, the delay was at most 5½ years for the '797 patent, but only 4 years for the '283 patent and 1½ years for the '177 patent. Because each of these periods of delay was less than six years, Brooks had the burden to prove that each was unreasonable and that it was materially prejudiced. It did not adequately show undisputed facts supportive of either element.

It strikes us as reasonable for Meyers to have waited to sue on his first patent (the '797 patent) at least until he could sue on both the first and second patents at the same time. As the district court recognized, the '797 and '283 patents are related. The '283 is a divisional of the '797, and, even though the claims are different in scope, Meyers alleges that the same nine models of Brooks' shoes infringe both patents. When Meyers learned of Brooks' alleged infringement in late 1982, his second patent application was already pending, and by autumn 1983 he knew it would soon issue. Awaiting issuance of the second patent to sue on both at once conserved both the parties' and the courts' resources. It may be that there are times when a patentee must bring suit before the expected issuance of the second of two related patents, *see, e.g., A.C. Aukerman Co. v. Miller Formless Co.,* 693 F.2d 697, 699 n. 4, 216 USPQ 863, 865 n. 4 (7th Cir.1982), but this is not one of them.

We have approved dismissals for laches where the delay was less than six years, but those cases are different from this one. *See MCV, Inc. v. King–Seeley Thermos Co.,* 870 F.2d 1568, 1573, 10 USPQ2d 1287, 1292 (Fed.Cir.1989) (plaintiff waited four years to bring claim for co-inventorship and co-ownership after expressly assenting to not being named co-inventor); *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1550, 221 USPQ 1, 10 (Fed.Cir. 1984) (plaintiff waited three years before amending its infringement complaint to name an additional product after it had notice of that product). "Laches is an equitable defense which depends on consider-

ation of all the facts in the particular case." *Jamesbury*, 839 F.2d at 1551, 5 USPQ2d at 1785. The facts before the district court here were not sufficient for summary judgment that the delays short of six years were unreasonable.

Brooks also did not adequately show prejudice resulting from the delay. It submitted an affidavit of its general counsel declaring that after 1983 it expanded its sales of shoes that incorporate the allegedly infringing sole construction,[2] expanded the number of different shoe models that incorporate that construction and spent hundreds of thousands of dollars developing and marketing those models. But these conclusory averments are not sufficient to show prejudice.

First, there is no support for Brooks' claim that it expanded sales of the accused shoes during the laches period. The sales data referred to in the affidavit does not show that total sales of the accused shoes increased after Meyers discovered the alleged infringement in late 1982 or early 1983. Because only a single figure for total sales from 1984 through 1987 is given, no trend can be discerned during this critical period. Nor can one see any increase over the preceding two-year period.[3] Furthermore, the sales figure for 1988 is far less than the average sales per year from 1984 through 1987. Thus, according to the record, sales of the accused shoe models remained the same or decreased during the laches period.

Second, even if Brooks incorporated the accused "rollbar" sole construction in a number of different shoe models and spent time and money developing and marketing the new shoe models, this does not show prejudice. Brooks had already geared up to produce the CHARIOT with its allegedly infringing "rollbar" sole construction and begun producing and selling it when laches began to run in late 1982 or early 1983. Sales of this shoe and others incorporating the same sole construction continued at the

same level thereafter. There is no evidence that Brooks developed new sole constructions, only that it incorporated the same sole construction in different shoe models. Therefore, the record supports the conclusion that the time and money Brooks spent introducing the new shoe models was not related to Meyers' patented invention and may have been spent anyway, regardless of whether the shoes incorporated the accused sole construction or some other noninfringing structure.

Moreover, Brooks has not shown any connection between its activities during the laches period and Meyers' silence. From all that appears, Brooks would have followed the same course regardless of what Meyers did or did not do. Brooks' project manager testified that Brooks never responded to outsiders who approached it with ideas for improving its products, and never changed its course of action on a shoe construction because of a submission of ideas from outside the company. Brooks ignored Meyers' patents, his offers to license and his subsequent silence, just as it would have disregarded any other outside inventor. Nor is there evidence that Brooks stopped selling shoes with the accused sole construction even after Meyers filed the complaint. So it appears that Brooks would have continued to sell these shoes even if Meyers had brought suit earlier. Thus, not only did Brooks fail to show that it acted to its detriment because of the delay, but the undisputed facts show that its actions were completely independent of Meyers.

In her affidavit, the general counsel also says that personnel having knowledge of the accused shoe models and other matters relating to this infringement suit have left Brooks and are no longer under its control. Other than to state that two of these people were the designers of the accused models, Brooks does not suggest how or why their testimony would be important to the

---

2. The sole construction which Brooks refers to and promotes as the "rollbar" is incorporated in the CHARIOT as well as all the other accused shoe models.

3. The cumulative sales of accused shoe models for 1982 and 1983 can be attributed mostly to 1983 because the first of these models, the CHARIOT, was first sold toward the end of 1982.

defense, or why they could not be subpoenaed if their testimony were needed. Finally, the affidavit says that documents relating to the allegedly infringing shoes have been lost or destroyed, but general statements like that are not sufficient.

The district court also granted summary judgment on Brooks' equitable estoppel defense based on the purportedly undisputed fact that Meyers contacted Brooks' general counsel by telephone in late August 1983 and notified her of the alleged infringement. The court characterized this contact as an "aggressive assertion of the alleged claim" of infringement. We think this is an overstatement that should not have been inferred from equivocal evidence that probably called for testimony. The record contains Meyers' handwritten memo that he told the general counsel that "she was infringing my patents." But his deposition denied ever having accused Brooks of infringement before filing the 1987 suit against the retailers. And contrary to Brooks, the affidavit of its general counsel does not fully corroborate Meyers' handwritten memo either.

All that aside, however, we do not believe that a suggestion of infringement coupled with an offer to license followed by silence would suffice to establish equitable estoppel. "Silence alone is not sufficient affirmative conduct to give rise to estoppel." *Hottel*, 833 F.2d at 1573, 4 USPQ2d at 1941. It can lead to estoppel if it is "sufficiently misleading to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims." *Id.* at 1574, 4 USPQ2d at 1941. We disagree that Meyers' silence in these circumstances was "misleading, indeed, so misleading as to amount to bad faith."

In *MCV*, 870 F.2d 1568, 10 USPQ2d 1287, the plaintiff's four-year silence followed a statement clearly indicating his acquiescence in the defendant's failure to name him as co-inventor. Here, there is no allegation that Meyers expressly declined to pursue an infringement claim against Brooks. In *Jamesbury*, 839 F.2d 1544, 5 USPQ2d 1779, the plaintiff's eight-year silence followed two letters to the defendant, the first advising him that he was infringing the plaintiff's patent, and the second informing him that the infringement had been referred to attorneys. In *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 481, 186 USPQ 1, 4 (7th Cir.1975), the plaintiff sent a letter threatening immediate legal action on its patent infringement claim. Here, Meyers might have told Brooks that its shoes infringed, but there was no threat of immediate suit, or even a hint that Meyers was contemplating litigation.

Our discussion in *Hottel*, 833 F.2d at 1574, 4 USPQ2d at 1941, is apt:

> In the cases that have applied intentionally misleading silence in the patent infringement context, a patentee threatened immediate or vigorous enforcement of its patent rights but then did nothing for an unreasonably long time. [Citations omitted.] No such threats were present here. Hottel's periods of silence did not follow any communication indicating that it would take immediate action, which if not followed up might indicate that it had dropped the matter.

So here too, the facts given the district court are not sufficient to prove that Meyers' silence was intentionally misleading or that it could have been perceived as an abandonment of a claim of infringement. The record does not warrant summary judgment.

### Conclusion

Accordingly, the judgment of the district court is reversed, and the case is remanded for further proceedings in accordance with this opinion.

### COSTS

Brooks will bear the costs of this appeal.
**REVERSED AND REMANDED.**