Eric P. GOLDWASSER

v.

SMITH CORONA CORPORATION
and Smith Corona Acer

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION.

Case No. 5–91–CV–21 (JAC).

United States District Court,
D. Connecticut.

March 10, 1993.

Michael M. de Angeli, Rockville, MD, Gene S. Winter, St. Onge, Steward, Johnston & Reens, Stamford, CT, for plaintiff.

Richard A. Horgan, Sheila Ozalis, Winthrop, Stimson, Putnam & Roberts, Stamford, CT, Milton Wolson, Malina & Wolson, New York City, for defendants Smith Corona Corp. and Smith Corona Acer.

Evan R. Chesler, Cravath, Swaine & Moore, New York City, for intervenor and counterclaim plaintiff Intern. Business Machines Corp.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, Chief Judge:

Pending before the court are plaintiff Eric P. Goldwasser's Motion for Summary Judgment On the Issues of Bars [sic] to IBM's Claim of Ownership (filed April 27, 1992) and International Business Machines Corporation's Motion for Summary Judgment for Ownership of U.S. Patent 4,891,786 (filed May 18, 1992).

### Background

Plaintiff Eric P. Goldwasser ("Goldwasser") alleges that defendants Smith Corona Corporation and Smith Corona Acer infringed U.S. Letters Patent 4,891,786 (the " '786 patent"). The U.S. Patent and Trademark Office ("PTO") issued the '786 patent to Goldwasser on January 2, 1990. Defendants Smith Corona and Smith Corona Acer assert that plaintiff lacks standing to sue for infringement and contend that the '786 patent should have been assigned by plaintiff to IBM as part of plaintiff's employment agreement with IBM. The court granted IBM's motion to intervene on December 20, 1991. IBM asserted a counterclaim against Goldwasser for ownership of the '786 patent. In its counterclaim, IBM seeks money damages as well as an order assigning the '786 patent to IBM.

### Review of Undisputed Facts

Goldwasser was an employee of IBM from July 1, 1968 to June 29, 1984.[1] As a condition of his employment, Goldwasser signed an Employee Confidential Information and Invention Agreement ("the Employee Agreement").[2] The Employee Agreement states in relevant part that plaintiff would assign to IBM all "right, title and interest in any invention or idea, patentable or not" relating "in any manner to the actual or anticipated business or ... actual or anticipated research and development of IBM" that is "made or conceived" while plaintiff is "working in IBM."[3] The Employee Agreement required plaintiff to disclose any such inventions or ideas to "the local IBM Patent Operations Manager" and execute any appropriate papers presented to him by IBM.[4]

---

**1.** Plaintiff's Statement of Facts Pursuant to Local Rule 9(c)2 ("Plaintiff's Rule 9(c) Statement"), *in* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment On the Issues of Bars [sic] to IBM's Claim of Ownership (filed April 24, 1992) ("Goldwasser Memo") at 2.

**2.** The Employee Agreement reads in relevant part:

4. I hereby assign to IBM my entire right, title and interest in any invention or idea, patentable or not, hereafter made or conceived solely or jointly by me:

 a. while working in IBM in an executive, managerial, planning, technical, research or engineering capacity (including development, manufacturing, systems, applied science, sales, and customer engineering); and

 b. which relates in any manner to the actual or anticipated business of IBM or its subsidiaries, or relates to its actual or anticipated research and development, or is suggested by or results from any task assigned to me or work performed by me for or on behalf of IBM....

5. I hereby agree that in connection with any invention or idea covered by paragraph 4:

 a. I will disclose it promptly to the local IBM Patent Operations Manager; and

 b. I will, on his request, promptly execute a specific assignment of title to IBM, and do anything else reasonably necessary to enable IBM to secure a patent therefor in the United States and in foreign countries.

Goldwasser Memo at Ex. 1 (Employee Agreement).

**3.** *Id.*

**4.** *Id.*

In 1979 and 1980, Goldwasser worked on a variety of tasks at the IBM Research Division headquarters in Yorktown Heights, New York.[5] The Research Division is responsible for conducting pure and applied research, both in basic fields of science and in particular technology areas of potential application to IBM's future products.[6] Goldwasser performed research on human factors of speech recognition, on speech disambiguation, and on an IBM speech filing system.[7]

In 1981 and 1982, Goldwasser worked in IBM's Field Engineering Division as an "interface" between information systems (IBM field engineers who worked directly with the customers) and planning (IBM staff programmers who developed programs to meet customer needs).[8] IBM's Field Engineering Division is responsible for servicing IBM computer customers. Goldwasser's job involved taking the customer requirements from field engineering personnel and translating them into programming projects.[9]

In 1982, IBM reassigned Goldwasser to a position as a staff programmer within IBM's Customer Engineering Division, which subsequently merged with the Field Engineering Division.[10] He continued in that position until he left IBM in June 1984. In this last position, Goldwasser evaluated the usefulness of various computer programs for IBM's Field Engineering Division,[11] including an evaluation of the IBM personal computer.[12]

While Goldwasser worked in these various positions, he invented certain improvements in word processing systems, specifically relating to text entry methods—that is, software programs designed to enter and manipulate text by the use of a computer system.[13] Goldwasser conceived of and reduced to practice the inventions which would later be embodied in two patents—U.S. Patent 4,559,-598 ("the '598 patent") and the '786 patent.[14]

Only two claims—claims 74 and 78—of the '786 patent are at issue in this lawsuit.[15] Claim 74 is an independent claim describing a spelling help method, wherein a list of words described on a screen may be added to text by the user.[16] Claim 78 is a dependent claim specifying that the method of Claim 74 can be activated or deactivated by pressing a key on the keyboard.[17]

On February 19, 1983, Goldwasser made a software submission entitled "PointWriter" to IBM's Software Submissions Program.[18] Under this program, IBM evaluated software in order to determine whether it had an interest in marketing the software for use

**5.** IBM's Statement of Undisputed Facts ("IBM's Rule 9(c) Statement"), *in* Memorandum of Law in Opposition to Eric P. Goldwasser's Motion for Summary Judgment and In Support of International Business Machines Corporation's Cross Motion for Summary Judgment (filed May 18, 1992) at 4.

**6.** *Id.*

**7.** *Id.* at 4–5.

**8.** *Id.* at 5.

**9.** *Id.*

**10.** *Id.* at 5.

**11.** *Id.* at 5–6.

**12.** *Id.*

**13.** Goldwasser Memo at 2.

**14.** *See* Goldwasser Memo at 2–3; IBM Memo at 6; Plaintiff's Memorandum of Law in Reply to IBM's Opposition to Plaintiff's Motion for Summary Judgment and In Opposition to IBM's Mo-tion for Summary Judgment (filed June 5, 1992) ("Goldwasser Reply") at 7; *see also* Pl.Interrog. Answer No. 3(a), *see* IBM Memo at Ex. 5; Pl.Supplemental Interrog. Answer No. 3, *see* IBM Memo at Ex. 6; and Goldwasser Dep.Tr. 75–77, *see* IBM Memo at Ex. 2. *See also* Transcript of Oral Argument of July 20, 1992 (filed July 30, 1992) ("Oral Argument") at 47.

**15.** The parties agree that the '598 patent is not at issue in this lawsuit. IBM Memo at 6–7; Goldwasser Memo at 3; International Business Machines Corporations' Memorandum in Reply to Eric P. Goldwasser's Opposition to IBM's Motion for Summary Judgment (filed June 26, 1992) ("IBM Reply") at 4; Oral Argument at 11. The parties have stipulated the tolling of the statute of limitations for "any patent other than [the '786] patent as of December 12, 1991." Goldwasser Memo at Ex. 10 (copy of December 16, 1991 stipulation).

**16.** Goldwasser Reply at 2 n. 3.

**17.** *Id.*

**18.** IBM Memo at 7.

with IBM's personal computer products.[19] In August 1983, the Software Submissions Program declined to market Goldwasser's PointWriter program.[20]

On February 22, 1983, while still employed at IBM, Goldwasser filed a United States patent application naming himself and Mrs. Goldwasser as joint inventors of the Point-Writer program.[21] This application would later become the '598 patent, which the PTO issued on December 17, 1985, after Goldwasser had left IBM; the '598 patent named plaintiff and his wife as joint inventors.[22] The *Official Gazette of the United States Trademark Office* of that date included a notice indicating the issuance of the '598 patent,[23] and a December 21, 1985 article in *The New York Times* noted the issuance of the patent to plaintiff and Mrs. Goldwasser.[24]

As noted above, the '598 patent is not the patent in dispute. The parties have signed a stipulation tolling the statute of limitations for the '598 patent and "any patent other than [the '786] patent as of December 12, 1991."[25] However, the '598 patent and the '786 patent are related in the following way: the application for the '786 patent is a so-called "continuation-in-part" application— a "continuation-in-part" of the '598 patent. *See* 37 C.F.R. §§ 1.62 and 1.78.[26]

On June 29, 1984, Goldwasser left IBM.[27] It is not disputed that as part of his "exit interview," Goldwasser signed a Statement of Understanding, in which he represented that he had disclosed all of his inventions and ideas to either his manager and/or an IBM Patent Attorney.[28] For the purposes of the present motion, "plaintiff admits that while

the PointWriter program and the subject matter of the PointWriter patent application [which later became the '598 patent] were fully disclosed to IBM on a number of occasions, none of these disclosures were made directly to an IBM Patent Operations Manager."[29] In addition, plaintiff concedes that he never specifically advised IBM that he and Mrs. Goldwasser had filed the '598 patent application.[30]

On June 25, 1985, almost a year after his departure from IBM, Goldwasser filed an application for what became the '786 patent—the patent in dispute here.[31] He filed for this patent solely in his name. The PTO issued the '786 patent on January 2, 1990.[32] Both parties concede that the invention embodied in claims 74 and 78 of the '786 patent was both conceived of and reduced to practice while Goldwasser was an IBM employee.[33]

### Standard of Review

■ Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505,

19. *Id.*

20. *Id.* at 8.

21. Goldwasser Memo at 3.

22. *Id.*

23. *Id.* at Ex. 3.

24. *Id.* at Ex. 4.

25. *Id.* at Ex. 10 (December 16, 1991 Stipulation).

26. *Id.* at 3. The PTO treated the inventions claimed in the applications resulting in the '598 and '786 patents as separate and distinct, in that the PTO did not require a Terminal Disclaimer as

to the '786 patent. *Id.* at 4 n. 1. *See also* IBM Reply at 4.

27. IBM Memo at 9.

28. *Id.*

29. Goldwasser Memo at 5 n. 3.

30. *Id.*; IBM Memo at 9.

31. IBM Memo at 10.

32. Goldwasser Memo at 3 and Ex. 2.

33. *See* note 14 *supra.*

2510, 91 L.Ed.2d 202 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (Feinberg, C.J.), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The non-moving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Finally, " 'mere conclusory allegations or denials' " in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

Goldwasser's motion is based on the statute of limitations, laches and estoppel, as to which claims he must demonstrate that there are no genuine issues of material fact in dispute and that the claims are barred as a matter of law. If IBM can show sufficient evidence in the record to allow a reasonable jury to find in IBM's favor with respect to the statute of limitations, laches and estoppel issues, Goldwasser's motion must be denied.

IBM's motion for summary judgment asserts that it is the owner of the '786 patent. With respect to this claim, IBM is the moving party and must therefore demonstrate that there are no genuine issues of material fact in dispute and that, as a matter of law, IBM is the owner of the '786 patent.

### I. Goldwasser's Motion for Summary Judgment

Goldwasser seeks summary judgment declaring that IBM's claim to the '786 patent and Smith Corona Corporation's and Smith Corona Acer's defenses to liability for patent infringement are barred by the statute of limitations, laches and estoppel.[34]

 The parties agree that IBM's counterclaim against plaintiff sounds in breach of contract, specifically breach of the Employee Agreement.[35] The interpretation of the Employee Agreement is a matter of New York law because plaintiff is a resident of New York and IBM is a New York corporation.[36] In addition, parties signed the Employee Agreement in New York when plaintiff joined IBM in 1968. Nevertheless, a federal court sitting in Connecticut will apply the Connecticut statute of limitations, because such statutes are said to be "procedural." *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496–497, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941). Both parties agree that the currently applicable Connecticut statute of limitations is six years pursuant to Conn.Gen.Stat. § 52–576(a).[37]

Goldwasser's arguments on statute of limitations, laches and estoppel hinge on the relationship between the '598 patent (applied for in 1983 and issued in 1985) and the '786 patent (applied for in 1985 and issued in 1990). Goldwasser argues that IBM had notice of the patent in dispute as early as 1983, when Goldwasser submitted a software program (later embodied in the '598 patent) to

---

34. Defendants Smith Corona Corporation and Smith Corona Acer deferred to IBM for a response to plaintiff's motion for summary judgment and concurred in the relief requested in IBM's memorandum in opposition to plaintiff's motion for summary judgment, *see* Defendants Smith Corona Corporation's and Smith Corona Acer's Response to Plaintiff's Motion for Summary Judgment (filed May 19, 1992) at 1–2.

35. Goldwasser Memo at 11; IBM Memo at 16–17.

36. *Id.*

37. Conn.Gen.Stat. § 52–576(a) states in relevant part:

No action ... on any contract in writing, shall be brought but within six years after the right of action accrues ...

In any case, New York's statute of limitations for breach of a written contract is likewise six years. N.Y.Civ.Prac.L. & R. § 213(2) (McKinney 1990).

IBM for its consideration.[38] Goldwasser claims that the statute of limitations, laches and estoppel period began to run upon the rejection of the software by IBM, and therefore, that IBM is now precluded from bringing its counterclaim against Goldwasser.

■ It will be recalled, however, that IBM is suing to assert property rights to the '786 patent, which was issued on January 2, 1990. As noted above, IBM seeks a declaration that claims 74 and 78 of the '786 patent belong to IBM, and those claims did not exist as part of an issued patent until a mere 23 months before this court granted IBM's motion to intervene. Although the '598 patent is not the patent in dispute,[39] the '598 and '786 patents are indeed related: the '786 patent is a "continuation-in-part" of the '598 patent pursuant to 37 C.F.R. §§ 1.62 and 1.78.[40] Nevertheless, the patents are treated separately for the purposes of adjudicating patent rights. *See Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1462 (Fed.Cir.1990) (trial court erred in basing its decision on a single laches period for three separate patents issued on separate dates; plaintiff could not have filed suit on a patent until after it was issued).

*Meyers* is instructive here, for in the instant case, the record is clear that IBM could have not sued for the '786 patent until January 2, 1990—the day the patent was issued. Goldwasser nevertheless argues that IBM's right of action accrued *before* January 2, 1990. He offers three theories, discussed below, as to when the right of action accrued and the statute of limitations began to run.

### A. Statute of Limitations

■ Goldwasser argues that IBM's claim is barred by the statute of limitations. In general, the statute of limitations for a breach of contract action begins to run when a cause of action "accrues." *See generally Associated Catalog Merchandising v. Chagnon*, 210 Conn. 734, 557 A.2d 525 (1989); *Beckenstein v. Potter & Carrier, Inc.*, 191 Conn. 150, 464 A.2d 18 (1983). The statute of limitations applicable here requires that

the cause of action for the breach of a written contract be brought within six years after the right of action accrues. Conn.Gen.Stat. Ann. § 52–576 (1991). However, a statute of limitations may be tolled due to fraudulent concealment. *See, e.g., Baskin v. Hawley*, 807 F.2d 1120, 1130 (2d Cir.1986) (applying Connecticut statute of limitations). In such a circumstance, the statute of limitations is tolled until the innocent party becomes aware of the wrongdoer's activities. *Id.*

The leading Connecticut case on the interpretation of the statute of limitations is *Kennedy v. Johns–Manville Sales Corp.*, 135 Conn. 176, 62 A.2d 771 (1948). In *Kennedy*, defendant insulated the walls of plaintiff's house in 1935 in an allegedly negligent manner. The plaintiff did not notice the damage until December 1945; he filed the lawsuit in 1946. The Supreme Court of Connecticut ordered the dismissal of the action on the basis of statute of limitations, but expressly noted that the statute of limitations for a breach of contract action begins to run upon the breach "except where there is something tantamount to a fraudulent concealment of a cause of action." *Kennedy*, 135 Conn. at 179, 62 A.2d 771.

Upon a review of the record, the court is unpersuaded by Goldwasser's argument that the statute of limitations began to run prior to the issuance of a patent on January 2, 1990. *Meyers, supra.* Even if the court assumes *arguendo* that the statute of limitations might have begun to run on a date prior to January 2, 1990, summary judgment for plaintiff would not be possible because his theories on when the statute of limitations began to run are not supported by applicable law.

#### 1. 1983: Rejection by IBM Software Submission Program

On February 19, 1983, Goldwasser made a software submission entitled "PointWriter"

---

**38.** Goldwasser Memo at 17–20.

**39.** The parties signed a stipulation tolling the statute of limitations for the '598 patent and any

patents other than the '786 patent on December 16, 1991. *See* note 25 *supra.*

**40.** *See* note 26 *supra.*

to IBM's Software Submissions program.[41] This PointWriter program would later become the '598 patent issued in December 1985.[42] Under the submissions program, IBM evaluated software in order to determine whether it had an interest in marketing the software for use with IBM's personal computer products. In August 1983, IBM declined to market Goldwasser's software submission.[43]

Goldwasser argues that the statute of limitations began to run upon rejection of the PointWriter program and that IBM is now "estopped" from claiming ownership of the '786 patent.[44] Goldwasser claims that IBM had "notice" of his PointWriter invention and IBM's failure to act on this "notice"—presumably by demanding that Goldwasser assign to IBM the patent application which would later become *the '598 patent*— somehow estops IBM from asserting rights to *the '786 patent*.[45]

It is important to recall that Goldwasser concedes that he never informed IBM Patent Operations or anyone else at IBM that he and his wife had filed the PointWriter patent application.[46] Yet he argues that IBM should somehow have known that an application would be made and that IBM should have demanded that Goldwasser assign the patent application—an application of which it had not been informed—to IBM.[47] At the very least, the admission by Goldwasser that he did not inform IBM of his patent application, coupled with IBM's allegations of fact,[48] raises a genuine issue of material fact as to the ability of IBM to demand assignment of the patent application.

In any event, the fundamental problem with Goldwasser's position is that he did not "own" the PointWriter program when he filed the patent application. Because Goldwasser conceived of and reduced to practice[49] the PointWriter program while he was working at IBM,[50] the PointWriter program belonged to IBM pursuant to the terms of the Employee Agreement.[51] The owner of the PointWriter program was IBM, not Goldwasser.[52]

Assuming *arguendo* that IBM had received "notice" of the invention or patent application, IBM was under no obligation to do anything—such as making a demand that Goldwasser assign the patent application to IBM—with respect to the PointWriter program. Pursuant to the terms of the Employee Agreement,[53] the PointWriter program belonged to IBM. In fact, the terms of the Employee Agreement do not require that IBM demand assignment of any patent application.[54]

In sum, even if IBM, the owner of the PointWriter program, had notice of the PointWriter program or the patent application for the PointWriter program, IBM could demand assignment of the PointWriter program at any time—either during the application process or after the PTO issued the patent. A breach of the Employee Agreement occurred only after IBM demanded assignment and Goldwasser refused to do

---

41. *See* text accompanying note 18 *supra*.

42. *See* text accompanying notes 21–24 *supra*.

43. IBM Memo at 8.

44. For a discussion of Goldwasser's estoppel and laches arguments, *see* Section I.B *infra*.

45. *Id.*

46. Goldwasser Memo at 17.

47. *Id.*

48. *Id.* at 9–12.

49. *See* note 14 *supra*.

50. For the terms of the Employee Agreement, *see* note 2 *supra*.

51. The validity and enforceability of the Employee Agreement are discussed in Section II. *See* Section II *infra*.

52. If Goldwasser had any doubt that he, rather than IBM, owned the PointWriter program, Goldwasser could have asked IBM for a written disclaimer of ownership with respect to any patent or patent application. Oral Argument at 70–71. However, Goldwasser failed to ask for a written disclaimer from IBM with respect to the PointWriter program. *Id.*

53. *See* note 2 *supra*.

54. *Id.*

so.[55] Only at that point would the breach of the Employee Agreement trigger the running of the statute of limitations.

### 2. 1984: Termination of Employment at IBM

■ On June 29, 1984, Goldwasser left IBM. Goldwasser claims that the statute of limitations began to run upon the end of his employment with IBM.[56] Since IBM did not intervene in this action until December 1991 (seven years later), Goldwasser claims that IBM is barred from suing on the '786 patent.

The argument is unconvincing. Under this view, the limitations period is measured from the date of the employee's separation from IBM, not from the date of the alleged breach. Goldwasser's exit from IBM was not, in and of itself, wrongful. Rather, it was his actions with respect to the '786 patent that gave rise to the IBM's cause of action. His exit alone could not and did not trigger the running of the statute of limitations regarding any claims based on the '786 patent issued in 1990.

### 3. Issuance of '598 Patent

■ The PTO issued the '598 patent on December 17, 1985. Goldwasser suggests that the statute of limitations for claims with regard to the '786 patent began to run upon issuance of this earlier patent.[57] However, Goldwasser points to no legal authority tying the issuance of one patent to the timeliness of a suit for title to another. In fact, the authority appears to be to the contrary: patents are treated separately for purposes of adjudicating patent rights regardless of the relationship between two patents. *Meyers*, 912 F.2d at 1462.

Under Goldwasser's theory, the limitations period with respect to claims relating to the '786 patent expired on December 17, 1991, six years after the issuance of the '598 patent. The parties having stipulated to an indefinite tolling of any statute of limitations with respect to the '598 patent—or "any patent other than [the '786] patent"—as of December 12, 1991,[58] under Goldwasser's theory IBM could sue for the title to the '598 patent (issued in 1985) but could not sue for title to the '786 patent because claims 74 and 78 were disclosed to IBM in 1983 as part of the Software Submissions Program (although the '786 patent itself was issued in 1990). In other words, IBM could sue for a patent issued in 1985 but could not sue for a patent issued in 1990.[59] The theory falls of its own weight.

Assuming *arguendo* that the court were to find that IBM's cause of action on the '786 patent accrued at some point earlier than the date of issuance of the '786 patent (January 2, 1990), such as Goldwasser's departure from IBM or the submission of the PointWriter program, the statute of limitations would be tolled if Goldwasser committed fraudulent concealment. Goldwasser concedes that he did not notify an IBM patent operations manager of the invention.[60] At the very least, this admission by Goldwasser, coupled with IBM's allegations of fact,[61] raises a genuine issue of material fact regarding the issue of fraudulent concealment. The question is whether Goldwasser's failure to inform an IBM patent operations manager that he had filed an application for the '598 patent (which included in some fashion what became claims 74 and 78 of the '786 patent) constituted some form of fraudulent concealment, thereby tolling the statute of limitations.

---

**55.** *Id.*

**56.** Goldwasser Memo at 27.

**57.** *Id.* at 31–32.

**58.** The stipulation, signed on December 16, 1991, between Goldwasser and IBM reads in relevant part:

> 1. The statute of limitations on any claims and/or defenses IBM may have against plaintiff, and on any claims and/or defenses plaintiff may have against IBM, which relate to or arise

in connection with any patent other than U.S. Patent 4,891,786 are tolled as of December 12, 1991.
> 2. Such tolling shall remain effective until counsel for plaintiff and IBM agree otherwise.

Goldwasser Memo at Ex. 10.

**59.** Goldwasser Memo at 7 n. 4; 32–33. *See also* IBM Reply at 10–12.

**60.** *See* note 30 *supra.*

**61.** *Id.* at 9–12.

## B. Laches and Estoppel

Goldwasser argues that in rejecting his "PointWriter" program for marketing by IBM, IBM waived any right to seek title to a patent later obtained by Goldwasser embodying any of the claims included in that program. He asserts the affirmative defenses of laches and equitable estoppel. Goldwasser bears the burden of persuasion and on his motion for summary judgment must show that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1038–39 (Fed.Cir.1992).

Laches is defined "as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman*, 960 F.2d at 1028–29. To invoke the laches defense, a defendant (here, third-party defendant Goldwasser) has the burden of proving that, "(1) [IBM] delayed filing suit for an unreasonable and inexcusable length of time from the time [IBM] knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant." *A.C. Aukerman*, 960 F.2d at 1032 (quoting *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961)).

An equitable estoppel defense has three elements: "(1) that the actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence[,] (2) the other [person] relies upon that communication[, and] (3) the other [person] would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct." *A.C. Aukerman*, 960 F.2d at 1041 (citation omitted). Finally, the court must "take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense of equitable estoppel to bar the suit." *Id.* at 1043.

Goldwasser claims that he disclosed the PointWriter program (which was later embodied in the '598 patent) to IBM in substantially the detail in which it was disclosed to the PTO.[62] He argues that the equitable doctrine of estoppel precludes IBM from now seeking assignment of the invention found in claims 74 and 78 of the '786 patent. In addition, he claims that IBM's laches in seeking an assignment of the PointWriter patent after a delay of eight years should bar IBM's action under general principles of equity.

Goldwasser bases his argument on the notion that his software submission put IBM on notice of its claims. However, it is important to recall that this is a suit for ownership of the '786 patent, which was issued in 1990. The thoughtful opinion of the Court of Appeals for the Federal Circuit in *A.C. Aukerman* discusses at great length the doctrines of laches and equitable estoppel. There the Court of Appeals held that the period of delay is measured from the time the plaintiff knew or should have known of the infringement to the date of suit, *id.* at 1032, but, in any event, "the period does not begin prior to issuance of the patent." *Id.* (citations omitted).

Goldwasser has offered no evidence that IBM delayed filing suit for an unreasonable and inexcusably long time. The earliest time that IBM could have known about the patent at issue here was the date of issuance of the '786 patent on January 2, 1990. IBM moved to intervene in this action on December 20, 1991—less than two years after the issuance of the '786 patent. None of the authorities drawn to the court's attention by Goldwasser supports the proposition that a delay of less than two years precludes a suit based on laches.

In a laches defense, Goldwasser must prove that the delay resulted in "material prejudice." *Id.* at 1033. "Such prejudice may be either economic or evidentiary." *Id.* (citation omitted). At the very least, the issue of prejudice raises genuine issues of material fact. Goldwasser merely claims that he has spent a great deal of money and

**62.** Goldwasser Memo at 31–35.

resources in securing and protecting these inventions but provides little more than conclusory statements for this position.[63]

In sum, Goldwasser's motion for summary judgment must be denied.

## II. IBM's Motion for Summary Judgment

IBM argues that a review of the undisputed facts of the case compels a finding that the '786 patent belongs to IBM.

It is conceded that Goldwasser conceived of and reduced to practice the invention embodied in claims 74 and 78 of the '786 patent while he was employed at IBM;[64] he was employed by IBM in several of the classifications delineated in the Employee Agreement;[65] and the invention relates directly to IBM's business.[66] Under the Employee Agreement, Goldwasser was obligated to assign the patent rights to this invention to IBM but failed to do so.[67] Instead, he filed for a patent in his own name, ultimately obtained the patent in 1990, and then sued Smith Corona and Smith Corona Acer for infringing it.

There is no dispute that Goldwasser entered into a contract with IBM by which he assigned his "entire right, title and interest" in any invention or idea made or conceived by him while he was employed at IBM, provided the invention or idea related to IBM's actual or anticipated business.[68] At the threshold, the court must determine whether the Employee Agreement is valid and enforceable because Goldwasser disputes the validity and enforceability of the Employee Agreement.[69] If the Employee Agreement is valid, then the court must determine whether Goldwasser and the '786 patent are subject to the terms of the Employee Agreement.

## A. The Employee Agreement

■ It is settled that employment agreements such as the one at issue here are valid and enforceable and that they do not violate public policy against unreasonable restraint of trade. *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933) ("One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment."). *See also, e.g., Syntex Ophthalmics, Inc. v. Novicky,* 795 F.2d 983, 985 (Fed.Cir.1986); *Patent & Licensing Corp. v. Olsen,* 188 F.2d 522, 525 (2d Cir.1951); *Conway v. White,* 9 F.2d 863, 866 (2d Cir.1925); *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 912 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986); *Universal Winding Co. v. Clarke,* 108 F.Supp. 329 (D.Conn.1952) (Hincks, C.J.); *Great Lakes Press Corp. v. Froom,* 695 F.Supp. 1440, 1449 (W.D.N.Y.1987).

In *Olsen,* in an action similar to the instant case where a company sought an assignment from an employee of patents developed by him while employed by the company, our own Court of Appeals held that "it is well settled that an agreement on the part of an inventor to assign inventions developed while in the employ of another is not inequitable or unconscionable." *Olsen,* 188 F.2d at 525. The Court of Appeals found it significant that the patents in dispute were useful to the company's business. *Id.*

In *Universal Winding,* an action raising the question of whether employment agreements such as the one at issue here violate public policy, Chief Judge Hincks (as he then was) held that the agreement was "not invalid or unenforceable as an unreasonable restraint on trade." *Universal Winding,* 108 F.Supp. at 338. In construing the terms of the employment agreement, the court held that the employee assumed an obligation to disclose to the employer all designs which he

63. Goldwasser Memo at 41.

64. *See* note 14 *supra.*

65. IBM Memo at Ex. 2 (Goldwasser Dep.Tr. 26–27, 29–33, 37–38).

66. *Id.* at Ex. 2 (Goldwasser Dep.Tr. 236–39).

67. *See* note 2 *supra.*

68. *Id.*

69. Goldwasser Reply at 20.

might make in the specified field within the particular time frame. *Id.* at 331.

## B. The Employee Agreement Covers Goldwasser and the '786 Patent

 The court must next determine whether (1) the '786 patent is subject to the Employee Agreement, and (2) there exist genuine issues of material fact that preclude summary judgment. There is no dispute that determination of patent ownership is a question of state law, *see, e.g., Great Lakes Press Corp.,* 695 F.Supp. at 1445, and that New York law governs the issues of ownership of the '786 patent and the interpretation of the Employee Agreement.[70]

For an invention or idea to fall under Paragraph Four of the Employee Agreement[71] three requirements must be satisfied: the employee must make or conceive the invention or idea while working in IBM;[72] the employee must be working in IBM "in an executive, managerial, planning, technical, research or engineering capacity (including development, manufacturing, systems, applied science, sales and customer engineering);[73] and, the invention or idea must relate "in any manner to the actual or anticipated business of IBM or its subsidiaries, or . . . to its actual or anticipated research and development, or is suggested by or results from any task assigned to .[the employee] or work performed by [the employee] for or on behalf of IBM."[74]

There is no dispute with respect to the first requirement of the Employee Agreement. Goldwasser admits that he conceived of and reduced to practice the inventions or ideas embodied in the '786 patent in 1983, while he was working in IBM and subject to the Employee Agreement.[75]

The second requirement of the Employee Agreement is that Goldwasser must have been employed in an executive, managerial, planning, technical, research or engineering capacity for the Employee Agreement to apply.[76] The crux of Goldwasser's argument is that the court should deny IBM's motion for summary judgment on the ground that he was not the type of employee, and his invention was not the type of invention, covered by the Employee Agreement. In fact, he asserts that he actually sought a position of the kind covered by the Employee Agreement but IBM rebuffed him.[77]

 The standard for summary judgment is that there is no genuine issue as to any *material* fact. Fed.R.Civ.P. 56(c). The opposing party may not rely on mere speculation, conjecture, or conclusory allegation to create an issue of material fact. *Knight v. U.S. Fire Ins. Co., supra; Quinn v. Syracuse Model Neighborhood Corp., supra.* Upon a full review of the record, it is clear that the evidence indicates that at all times during the relevant time period, Goldwasser was employed in one of the capacities enumerated in the Employee Agreement. His job assignments included research, technical and planning responsibilities.[78]

Even if the evidence is viewed in the light most favorable to Goldwasser, who is opposing summary judgment, *see Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513, a review of his job titles and responsibilities support the finding that the Employee Agreement applied to him. From 1978 to 1982, Goldwasser served as a Program Administrator. This job involved specific planning. It required technical skills, such as taking requirements from field engineering personnel, translating them into programming projects and ascertaining the amount of time it would take to perform these projects.[79] From 1982–84,

---

**70.** *See* Goldwasser Memo at 11; IBM Memo at 17–18 n. 10.

**71.** *See* note 2 *supra.*

**72.** *Id.*

**73.** *Id.*

**74.** *Id.*

**75.** *See* note 14 *supra* and accompanying text.

**76.** *See* note 2 *supra.*

**77.** Goldwasser Reply at 19; Oral Argument at 61–63.

**78.** *See, e.g.,* IBM Memo at Ex. 2 (Goldwasser Dep.Tr. 18–27, 37–38).

**79.** *Id.* at 40–41 n. 25.

Goldwasser served as a Staff Programmer. This job involved specific research and technical skills, such as evaluating the IBM personal computer to determine the types of software which may be best utilized in the Field Engineering Division.[80] IBM clearly viewed Goldwasser's positions as covered by the Employee Agreement.[81]

Finally, for an invention or an idea to be subject to the Employee Agreement, it must relate to the actual or anticipated business of IBM.[82] Goldwasser claims that his invention of text entry did not relate in any manner to the actual or anticipated business of IBM.[83] The court is unpersuaded by this argument. Upon a full review of the record and viewing the evidence in the light most favorable to Goldwasser, the court is convinced that an invention or idea which involves the entry of text into a computer relates to IBM's "actual or anticipated business." It is noteworthy that IBM is the largest manufacturer of computers in the world.[84] It seems commonsensical that a method to improve text entry is related to the business of a computer manufacturer, that IBM's business necessarily involves improving the performance of computers and that one method of doing so is by improved text entry. Indeed, Goldwasser does not disagree.[85]

*C. Goldwasser Breached His Employee Agreement*

■ Since the court has found that the Employee Agreement is valid, and that Goldwasser and his ideas are covered by it, the court now considers the argument that Goldwasser breached this Employee Agreement. It is uncontested that Goldwasser never assigned the inventions and ideas embodied in the '786 patent to IBM. By failing to make such an assignment, he violated Paragraph Four of the Employee Agreement. *See, e.g.,*

*Misani v. Ortho Pharmaceutical Corp.,* 44 N.J. 552, 210 A.2d 609 *cert. denied,* 382 U.S. 203, 86 S.Ct. 398, 15 L.Ed.2d 270 (1965) (upholding employee agreement requiring employee to assign to company all rights in inventions and ideas which she might make or conceive during employment).

Pursuant to Paragraph Four of the Employee Agreement,[86] Goldwasser had an obligation to assign to IBM his rights in any inventions subject to that paragraph. Pursuant to Paragraph Five of his Employee Agreement, Goldwasser was under an obligation to assign patents to IBM upon a request for an assignment.[87] Specifically, Goldwasser agreed that with respect to inventions or ideas covered by Paragraph Four, "I will, on his [IBM Patent Operations Manager] request, promptly execute a specific assignment of title to IBM...." [88]

In April 1991, IBM became aware of the '786 patent. Upon further investigation, IBM learned that the '786 patent was subject to Paragraph Four of Goldwasser's Employee Agreement. On August 27, 1991, IBM made a demand upon Goldwasser's counsel for an assignment of the '786 patent pursuant to Paragraph Five of the Employee Agreement.[89] Goldwasser failed to execute such an assignment. That failure is a breach of this provision. *See Frigi–Griffin, Inc. v. Leeds,* 52 A.D.2d 805, 383 N.Y.S.2d 339, 341 (1976) (cause of action accrues after a demand is refused). *See also Lopez v. Highmount Associates,* 101 A.D.2d 618, 474 N.Y.S.2d 875, 877 (1984) (enforcing contract to convey land upon demand); *Rossi v. Oristian,* 50 A.D.2d 44, 376 N.Y.S.2d 295, 298 (1975) (enforcing contract to assign stock upon demand).

*Conclusion*

Upon a review of the record, plaintiff Eric P. Goldwasser's Motion for Summary Judg-

80. *Id.*

81. *Id.* at Ex. 3 (Wunderli Dep.Tr. 111–112); *Id.* at Ex. 4 (Dep.Tr. 40–41).

82. *See* note 2 *supra.*

83. Goldwasser Reply at 19.

84. IBM Memo at 42.

85. IBM Memo at Ex. 2 (Goldwasser Dep.Tr. at 238–39).

86. *See* note 2 *supra.*

87. *Id.*

88. *Id.*

89. IBM Memo at 12 n. 7.

ment On the Issues of Bars [sic] to IBM's Claim of Ownership (filed April 27, 1992) (doc. # 120) is hereby DENIED and International Business Machines Corporation's Motion for Summary Judgment for Ownership of U.S. Patent 4,891,786 (filed May 18, 1992) (doc. # 124) is hereby GRANTED. Judgment shall enter for IBM.

It is so ordered.