**LAKE CARYONAH IMPROVEMENT ASSOCIATION, etc., Plaintiff,**

v.

**PULTE HOME CORPORATION, Defendant.**

No. 88 C 3495.

United States District Court, N.D. Illinois, E.D.

Feb. 2, 1989.

John J. Verscaj, D. Scott Hargadon, Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff.

Barbara Baran, Alexander R. Domanskis, Joann T. Angarola, Paul J. Dezenberg, Ross & Hardies, and Charles L. Byrum, Timothy J. Riordan, DeFrees & Fiske, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

In 1968 the City of Naperville (City) annexed approximately 105 acres, and in 1970 the City approved, in concept, the development of the property as R–3 multiple dwelling, with an overall density of 22 units per acre. The 1970 ordinance further provided, among other things, that the property owners were to maintain certain designated open space and submit, in stages, plats for planned unit development (PUD).

Five years later the City granted preliminary PUD approval for a development of a 55–acre portion of the tract, the project being known as the Lake Caryonah Planned Unit Development. The approval was subject to the requirement that prior to final plat approval "Lot 1" (which, we are told, was to be located elsewhere in the 105–acre tract) be conveyed to the City for use as a permanent open space under the City's open space policy, or that Lot 1 be otherwise restricted in a manner agreeable to the City so as to provide permanent open space. A phasing plan at that time indicates that 904 multi-family units were to be built over time in four phases. The first phase was to have 320 multi-family units on the northern portion of the tract, some 16 acres.

On March 23, 1977, a "close-out package" was recorded in DuPage County. That package contains a number of documents relevant here. One is a November 3, 1976 ordinance authorizing a planned unit development of Lake Caryonah Phase 1 and granting final subdivision approval for Phase 1A as a special use for part of the larger development in accordance with designated plats and an October 4, 1976 statement of intent and agreement (SIA). The SIA was entered into by Honeybee Development Company as subdivider, a land trustee as owner, and the City. The subdivider and owner there agreed to develop the subdivision in accordance with the plans and supporting documents "as required by the Subdivision Control Ordinance and Planned Unit Development Ordinance". Paragraph 6 recognizes that a public park donation of 3.113 acres is required for the subdivision by applicable City ordinances; that the annexation agreement originally provided for the conveyance of Lot 1 to satisfy all park requirements of the entire development and that this conveyance will be made; and that the subdivider and owner agree to provide 6.79 acres of common open space in Phase 1A, thus having a credit of 3.677 acres toward park donations for future phases. In paragraph 7 the subdivider and owner agree to convey to a property owners association those properties identified on the planned unit development preliminary plat as private open space and all properties identi-

fied as common open space on the proposed final plat.[1]

The package also includes a copy of the articles of incorporation for the property owners association, named the Lake Caryonah Improvement Association (Association), and a Declaration of Covenants and Restrictions (Declaration) executed by the subdivider and owner, collectively referred to as the "developer." That document recites that the developer incorporated the Association to, among other things, enforce various covenants and restrictions, including those arising from the dedication of land. It designates lots 15, 16, 17 and 18 on the Phase 1 subdivision plat as common area. The Declaration, the final plats and other documents, are defined as Lake Caryonah documents which are to be construed as covenants running with the land. Title to the common areas was to be conveyed to the Association in due course, and the Association would thereafter be responsible for the maintenance and taxes. The common areas are, essentially, the portions of the property outside the building lot lines and not part of the drive system.

The Phase 1A land was and is an irregularly-shaped property south of the Phase 1 development and separated from it by property which was to be developed as Phase 2. It was not expressly designated as a "common area" in the Declaration of Covenants and Restrictions but it is expressly included in the property subject to the Declaration and it is designated as a common open space in the SIA. It was expected that much of the Phase 1A land would be used as a drainage retention pond, and so it has. That property was not conveyed to the homeowners association and, until recently, it did not request conveyance. In the meantime Phase 1 was developed, but the developer then apparently fell upon evil days. In any event, only the units on the northern 16 acres of the intended 55 acre Lake Caryonah project were completed, and the other acres remained vacant.

In 1980, after public notice and hearings, the City developed a comprehensive new zoning ordinance. That ordinance zoned the entire 55 acres as R-3 medium density multi-family, thereby causing the developed portion to be non-conforming (R-3 density being considerably less than the PUD density built on the 16 acres), and any future development of the remaining acreage at the density earlier contemplated became illegal.

To avoid foreclosure, the developer in 1980 deeded the entire subdivision, including Phase 1A, to another land trust, of which a subsidiary of the Central National Bank (Bank) was the beneficiary. The common area within Phase 1 was conveyed to the Association that same month. The Bank and its successors paid the real estate

1. "6. Public Parks: Per City of Naperville Ordinance No. 72–20 (revised Ordinance No. 74–52), the park donation requirement for this subdivision is 3.113 acres. In accordance with the above-referred to Annexation Agreement, Lot 1 (Block 1 in Signal Point Unit # 1) is to be conveyed to the CITY for use as permanent open space, said lot being owned by Cavalcade Development Corporation. Said property was to constitute as full consideration and satisfaction of all park requirements of the CITY for the entire Signal Point development. In addition to the above SUBDIVIDER AND OWNER hereby assigns any and all rights under its contract for purchase of the herein referred to property which it may have acquired by said contract to enforce the conveyance of said Lot 1 of Signal Point Unit # 1 to the CITY. Further, SUBDIVIDER AND OWNER hereby provides in Phase 1–A, 6.79 acres, all of common open space. Therefore, the total amount of common open space is 6.79 acres and provides SUBDIVIDER AND OWNER with a credit of 3.677 acres to be used as a credit against any park donations in future units.

"7. Private Open Space: The SUBDIVIDER AND OWNER has agreed to convey to a property owners association, subject to drainage easements, those properties identified on the Planned Unit Development Preliminary Plat as private open space and all those properties identified as common open space on the proposed final plat; all of which property is to be utilized for storm drainage uses and as private open space and recreational area as defined in the ordinances of the CITY relating to school and park district donations; said property and all improvements installed thereof, including the storm drainage easements and swales and any improvements installed pursuant to the aforementioned plans and specifications will be fully and permanently maintained by said property owners association. Copies of the proposed declaration of protective covenants and bylaws of the property owners association are attached hereto and identified as Exhibit X."

taxes on the Phase 1A property for the years 1978–1985 and paid for the title insurance and, at various times from 1982 through 1985, had the weeds cut, listed the property for sale and posted the property with "no trespassing" and "for sale" signs. In 1980 an association of homeowners of a portion of the Phase 1 property forwarded to the developer the Phase 1A tax bill it had received.

In 1986 the beneficial interest in the Phase 1A land trust was sold to the Howard Savings & Loan Association. On October 8, 1986, defendant entered into a contract to buy the property. While apparently plans were being formulated for the development of the parcel, the plaintiff, in April 1987, laid claim to the Phase 1A property. On May 18, 1987, defendant received preliminary subdivision plat approval from the City for the development of 214 townhouse units and two single-family homes on the vacant "Lake Caryonah" property, including almost all of the Phase 1A property, and shortly thereafter took legal title. A year later defendant received final plat approval for 88 townhouses and two single-family homes on a portion of the property, that plat also providing for the dedication of land primarily for a drainage retention pond in an area correlating to but not the same configuration or exactly in the same location as the Phase 1A retention pond. This suit was filed in state court shortly before that final approval, and it has been removed to this court on the basis of diversity jurisdiction. It seeks declaratory and injunctive relief.

The plaintiff claims that, pursuant to sections 6 and 7 of the 1976 SIA, the owner of Phase 1A agreed, as a covenant running with the land, that the property was dedicated for storm drainage, private open space and recreational areas and facilities for the benefit of Phase 1, and that it agreed to convey the property to the homeowners association. While the Association was not a signatory to the SIA, the members are successors-in-interest to the developer with respect to Phase 1 and the Association, by having vested rights in Phase 1A, is the successor in interest to Phase 1A. The Association, on behalf of its members, is also a third party beneficiary of the SIA. Defendant in turn, according to plaintiff, is a successor to the interests of the developer and is bound by the obligations created by the SIA. The Association asks that this court declare that the SIA is binding upon defendant, order the defendant to convey the Phase 1A property to plaintiff, and enjoin defendant from taking action with respect to the Phase 1A property which is inconsistent with plaintiff's rights.

Defendant has moved to dismiss upon a variety of grounds. Both parties have presented numerous exhibits and have largely agreed upon a local rule 12(f) statement of material facts. At an oral discussion of the matter the parties also were most helpful in clarifying some facts and in explaining their respective positions. We treat the motion, therefore, as one for summary judgment.

Who agreed or indicated an intention to do what is somewhat confused by the imprecision of the language in the SIA and the Declaration. The SIA refers to Phase 1A as "common open space" in paragraph 6 and, in paragraph 7, to an obligation to convey to a property owners association those properties identified on the PUD preliminary plat as "private open space," and all properties identified on the proposed final plat as "common open space," all of which is to be used for "storm drainage uses and as private open space and recreational area," as defined by the ordinances relating to school and park district donations. The SIA refers to the Declaration, which expressly defines the "COMMON AREA" as those lots in Phase 1 which are outside the building lines, "and additional property which may be added thereto by subsequent subdivision plats." Phase 1A was declared to be an existing property subject to the Declaration. Regardless of how one interprets the various terms, however, it seems clear that a homeowners association was supposed to end up with the Phase 1A property for use as a retention pond and for recreational purposes for the benefit of a fully developed Lake Caryonah PUD.

Plaintiff contends that the obligation to convey Phase 1A is, by its terms, linked only to the development of Phase 1, and the language of the SIA certainly is capable of that interpretation. The SIA, according to plaintiff, created a restrictive covenant running with the land which is binding on successors, such as defendant, and may be enforced by the benefitted person, such as the Association, even if the restriction is greater than the zoning regulations, *Wier v. Isenberg,* 95 Ill.App.3d 839, 420 N.E.2d 790, 51 Ill.Dec. 376 (2d Dist. 1981); that the Association is at least a third party beneficiary of the SIA, *Briarcliffe West Townhouse Owners Association v. Wiseman Construction Company,* 118 Ill.App.3d 163, 454 N.E.2d 363, 73 Ill. Dec. 503 (2d Dist.1983); that there has been no change so radical and complete as to render the restriction unreasonable, *Moore v. McDaniel,* 48 Ill.App.3d 152, 362 N.E.2d 382, 5 Ill.Dec. 911 (5th Dist.1977); that plaintiff is not barred by Pulte and its predecessors paying the taxes the last seven years because they did not manifest possession of the vacant property; and that it is not barred by *laches* because it acted as soon as its right to quiet enjoyment was challenged and Pulte was aware of plaintiff's preexisting rights—or at least the issues of possession and *laches* are questions of fact.

The contention has surface plausibility, but we do not believe it can carry the day. It is vulnerable in several respects.

Two interests and four actors are involved in this dispute. One interest is title to Phase 1A. The other is the use of the Phase 1A property. The actors are the City of Naperville, the developer and its successors, the mortgagee (the Bank was, apparently, both land trustee and mortgagee) and its successors, and the home owners in Phase 1, acting through the Association. We hear very little about the mortgagee. The Declaration indicates, however, that Phase 1A was included in the mortgage, that the developer was supposed to convey it free of any liens, and that the mortgagee retained its rights until it was paid. It wasn't paid; the developer gave a deed in lieu of foreclosure and Pulte ultimately derived its rights from that deed. We do not understand how the Association could have compelled the developer to convey land in such a fashion as to cut off the rights of the mortgagee or, for that matter, how the developer and the City could agree to restrictions which substantially reduced the market value of the property without the concurrence or payment of the mortgagee. We do not, however, explore that further because the parties have not argued the matter and perhaps we misunderstand.

A document similar to an SIA was considered in a contract context in *Briarcliffe,* although without extended analysis. There, however, the particular obligation—maintaining the water service—was peculiarly for the private benefit of the homeowners. But an SIA is a special breed of cat. It memorializes a developer's obligations to the municipality to ameliorate the effects of its activities upon the entire community by providing park land, school land and/or money. *See Krughoff v. City of Naperville,* 68 Ill.2d 352, 369 N.E.2d 892, 12 Ill.Dec. 185 (1977). Here those effects have substantially changed. The development did not go forward as proposed. The City has adopted zoning which significantly reduces the contemplated density and has approved Pulte's superseding plat. By the restrictive zoning and approval of the subsequent plat the City has manifested its judgment that the open area needs of the community have changed and that, in the platted land, the plat dedication is sufficient. Perhaps the developer and the City could not decide to eliminate a benefit peculiarly applicable to the homeowners, but we question whether the City is disabled from controlling land use outside the developed portion as circumstances change. Indeed, it probably had an affirmative obligation to proportion its requirements to those changing circumstances. Perhaps the collapse of the developer is a sufficient changed circumstance to terminate the restrictions, *Piper v. Reder,* 44 Ill.App.2d 431, 195 N.E.2d 224 (1st Dist. 1963). Perhaps the SIA obligations, based on a specific and now defunct PUD, termi-

nated when differing land use restrictions were adopted, *State National Bank v. Zoning Board of Appeals*, 81 Ill.App.3d 105, 400 N.E.2d 433, 36 Ill.Dec. 13 (1st Dist.1980). Perhaps the restraints should be strictly construed to apply only if the proposed development had been completed, as restraints are not favored, *Postal Telegraph–Cable Co. v. Western Union Telegraph Co.*, 155 Ill. 335, 40 N.E. 587 (1895). Perhaps the City and a subsequent developer could amend either because Illinois law would no longer recognize the extensive vested rights concept urged by plaintiff, or because which homeowners association was supposed to have rights is uncertain, or because the Association was a donee beneficiary. *See Board of Education v. Village of Hoffman Estates*, 126 Ill.App.3d 625, 467 N.E.2d 1064, 81 Ill.Dec. 942 (1st Dist.1984).

We are unsure, in this era of PUDs and negotiated land use regulations, what directions the Illinois courts may follow. We are persuaded, however, that they would conclude that a portion of an aborted development could not insist that an anticipated land use for the larger development, whether it was for parks or for schools, was cast in stone forever and that the municipality could not alter uses in light of changed circumstances. We do not, however, further consider the paths to that conclusion because we believe that plaintiff's claim is clearly barred by both limitations and *laches*.

■ Whenever a person having color of title, made in good faith, to vacant land, pays all the taxes for seven years (and that includes predecessors in the chain of title), that person is the legal owner. Ill.Rev. Stat. ch. 110, ¶ 13–110. The courts have added a requirement that the person also have possession. *Robertson v. Bachmann*, 352 Ill. 291, 185 N.E. 618 (1933). The parties assume that this section applies, although the more usual case involves one claimant with an unrecorded or tardily recorded deed who thereafter paid the taxes, and another claimant with a superior paper title who did not. Here the defendant is the record owner and the plaintiff has no color of title but only a claim that it should be conveyed title. If we assume that the section applies, then it is undisputed that defendant and its predecessors paid the taxes for more than seven years and the only issue is notoriety of possession. That possession need not be continuous or commence at the beginning of the seven years. It is enough that the person relying upon the limitation has to apprise, in some fashion, the community or neighborhood that the property is in the use and enjoyment of the person so appropriating it, sufficiently to arrest attention and put others claiming title upon inquiry. *Slatin's Properties, Inc. v. Hassler*, 53 Ill. 2d 325, 291 N.E.2d 641 (1972). What was done to indicate possession is a question of fact, but the legal effect is a matter of law. Some pruning the day before suit was filed is not enough, *Robertson v. Bachmann, supra,* but some blazes on trees and submerged traps can be sufficient, given the presumption in favor of the holder of legal title, *Le Sourd v. Edwards*, 236 Ill. 169, 86 N.E. 212 (1908). Here the facts are not in dispute: defendant and its predecessors hold and held legal title, they paid the taxes and title insurance; the Association knew it was not the owner, did not pay the taxes, and was aware that the developer and its successors retained title (indeed, in 1980 some of the homeowners forwarded to the developer the Phase 1A tax bill they had received); and at various times 1982–1985 the record owner had the weeds cut, listed the property for sale and posted the property with "no trespassing" and "for sale" signs. Clearly the property was reputedly owned by the developer and its successors and was so considered by the neighborhood, and their postings and maintenance, modest though they may have been, were sufficient to constitute possession. *Klingel v. Kehrer*, 81 Ill.App.3d 431, 401 N.E.2d 560, 36 Ill.Dec. 719 (5th Dist.1980).

■ We come to the same result on the basis of *laches*. Plaintiff was aware of its claim for many years but did not assert it. Perhaps it was content to permit others to pay the taxes and provide the minimal necessary maintenance so long as Phase 1A and the intervening property remained va-

cant. It asserted its claim only after defendant had obligated itself to purchase the property as part of a larger contemplated development under the 1980 rezoning. There was then nothing to suggest that plaintiff would assert any rights other than the SIA relating to an abandoned development under a then illegal PUD. What constitutes *laches* depends on the circumstances, and the circumstances here lead to the invocation of that equitable doctrine, *see Slatin's Properties, Inc. v. Hassler, supra; Bobin v. Tauber*, 45 Ill.App.3d 831, 360 N.E.2d 368, 4 Ill.Dec. 432 (1st Dist.1977); *First National Bank of Mt. Vernon, Illinois v. Conference Claimants Society*, 109 Ill.App.2d 477, 248 N.E.2d 718 (5th Dist. 1969).

Defendant's motion for summary judgment is granted.