**LAKE CARYONAH IMPROVEMENT ASSOCIATION, a not-for-profit Illinois corporation d/b/a Naper Trails Homeowners Association, Plaintiff–Appellant,**

v.

**PULTE HOME CORPORATION, Defendant–Appellee.**

No. 89–1429.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1989.

Decided May 31, 1990.

---

John J. Verscaj, Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff-appellant.

Barbara Baran, Ross & Hardies, Charles Byrum, Defrees & Fiske, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, and RIPPLE and MANION, Circuit Judges.

BAUER, Chief Judge.

This case is before us on appeal from the district court's grant of appellee's motion for summary judgment. In the court below, appellant Lake Caryonah Improvement Association ("the Association") filed suit seeking specific performance of an alleged contract to convey a tract of land currently owned by appellee Pulte Home Corporation (".Pulte"). The court found that the Association's claim was barred by the statute of limitations and/or the doctrine of laches, and therefore granted Pulte's motion. Because we agree that the Association's claim is barred by laches, we affirm the district court's grant of summary judgment.

I.

In 1968, the City of Naperville ("the City") annexed a 105 acre parcel of land and two years later zoned it for high density development. In 1975, the City granted Honeybee Development Company ("Honeybee") preliminary planned unit development ("PUD") approval to develop 55 of those acres. The project was called the Lake

Caryonah Planned Unit Development ("LC–PUD"), and was to consist of 904 multi-family units to be developed in four phases. By Ordinance No. 76–121, the City granted final PUD approval for Phase I of the LC–PUD. Phase I called for the completion of 320 units on approximately 16 of the 55 acres of land. The City also granted final subdivision plat approval for Phase IA, which called for the construction of a retention pond to collect storm water drainage from the Phase I development, the remainder of the LC–PUD, and other properties. The Phase IA property was located approximately in the center of the 55 acres and was part of what was proposed to be Phase II of the LC–PUD.

In connection with Ordinance 76–121, Honeybee as subdivider, a land trustee as owner, and the City entered into a Statement of Intent and Agreement ("SIA"), pursuant to which the subdivider and owner agreed to develop the subdivision in accordance with the plans and supporting documents "as required by the Subdivision Control Ordinance and Planned Unit Development Ordinance." In Paragraph 7 of the SIA, the subdivider and owner agreed to convey to a property owners association certain common open space. The "common area" of Phase I property and the whole of Phase IA were among those properties designated for conveyance.

Thereafter, Honeybee constructed the multi-family development and "common area" in Phase I and the above-mentioned retention pond in Phase IA. Honeybee, however, never completed the other three phases of the LC–PUD. It went into default under its mortgage and, in November of 1980, deeded the subdivision, including Phase IA and the "common area" of Phase I, to the Central National Bank ("the Bank"). In December of 1980, the Lake Caryonah Improvement Association received a deed to and the release of the Bank's mortgage rights for the Phase I "common area," but not for the Phase IA property.

While Honeybee was having financial difficulties, the City was considering comprehensive amendments to the earlier land use ordinances. In January of 1980, the City rezoned the entire 55 acres of the LC–PUD to an R3 medium density residential classification and removed the property's PUD designation. Because R3 density was considerably less than the density contemplated by Ordinance 76–121 development of the remaining acreage under the original plan became illegal.

The Bank and its successor, the Exchange National Bank, held the subdivision, including Phase IA, until 1986. During this time, the Bank paid real estate taxes on the property, posted "No Trespassing" and "For Sale" signs on the property, maintained the property by cutting weeds, and carried title and liability insurance on the property. In 1986, the property was sold to Howard Savings and Loan ("Howard") which paid real estate taxes for that year.

Shortly after Howard's purchase, appellee Pulte Home Corporation ("Pulte") became interested in developing a portion of the property. On October 8, 1986, Howard and Pulte entered into a contract to purchase a portion of Howard's property which included all but a small part of Phase IA. On May 18, 1987, Pulte received preliminary subdivision plat approval from the City for its proposed development of 214 townhouse units and two single-family homes. Shortly thereafter Pulte took legal title to the property. A year later Pulte received final plat approval for 88 townhouses and two single-family homes on a portion of the property. The plat also provided for a dedication of land to serve primarily as a drainage retention pond in an area correlating to, but not in the same configuration or exact location as, the Phase IA retention pond.

On April 22, 1987, the Association wrote to Howard, requesting that Howard convey the Phase IA property to it pursuant to the 1976 SIA. Howard refused. Pulte subsequently rejected the Association's demand as well. On April 21, 1988, the Association filed suit in state court seeking specific performance of Paragraph 6 of the SIA, which stated that certain properties, among which included Phase IA, would be con-

veyed to a homeowners association. Pulte removed the case to federal district court based upon diversity of citizenship. Pulte then filed a motion to dismiss (which the district court treated as a motion for summary judgment) contending, *inter alia,* that the Association's suit was barred by the statute of limitations and/or laches. The district court granted the motion, finding that the suit was barred on either ground. The Association then filed a timely notice of appeal.

## II.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). As to the Association's rights, if any, under the SIA, there is substantial legal and factual dispute. Pulte contends: (1) the SIA is not an enforceable contract; (2) the 1980 ordinance rezoning the property abrogated the 1976 SIA; (3) the Association is not the homeowners association contemplated by Paragraph 7 of the SIA; and (4) the conveyance of Phase IA to a homeowners association was dependent upon the completion of Phases II–IV. The Association, of course, contends the opposite. Although the district court had grave doubts

about the enforceability of the SIA by the Association, it did not decide any of the above disputes.[1] Instead, it found that the Association's claim was barred by the statute of limitations or by laches.

■ The Association argues that the district court erred by applying the statute of limitations set forth in Section 13–110 of the Illinois Code of Civil Procedure to bar its claim. The statute provides, in pertinent part:

> Whenever a person having color of title, made in good faith, to vacant and unoccupied land, shall pay all taxes legally assessed thereon for 7 successive years, he or she shall be deemed and adjudged to be the legal owner of such vacant and unoccupied land, to the extent and according to the purport of his or her paper title.

Ill.Rev.Stat. ch. 110, ¶ 13–110. The Association contends that the appropriate statute of limitations is the ten year period set forth in Section 13–206, which governs a claim for breach of a written contract. See Ill.Rev.Stat. ch. 110, ¶ 13–206.

We agree that § 13–110 is not applicable to the Association's claim. Section 13–110 bars the rights of the owner of paramount title when the holder of color of title has taken possession of the vacant land and

---

1. The district court stated:

 [A]n SIA is a special breed of cat. It memorializes a developer's obligations to the municipality to ameliorate the effects of its activities upon the entire community by providing park land, school land and/or money. *See Krughoff v. City of Naperville,* 68 Ill.2d 352, 369 N.E.2d 892, 12 Ill.Dec. 185 (1977). Here those effects have substantially changed. The development did not go forward as proposed. The City has adopted zoning which significantly reduces the contemplated density and has approved Pulte's superseding plat. By restrictive zoning and the approval of the subsequent plat the City has manifested its judgment that the open area needs of the community have changed and that, in the platted land, the plat dedication is sufficient. Perhaps the developer and the City could not decide to eliminate a benefit peculiarly applicable to the homeowners, but we question whether the City is disabled from controlling land use outside the developed portion as circumstances change ... Perhaps the collapse of the developer is a sufficient changed circumstance to terminate the restrictions, *Piper*

 *v. Reder,* 44 Ill.App.2d 431, 195 N.E.2d 224 (1st Dist.1963). Perhaps the SIA obligations, based on a specific and now defunct PUD, terminated when differing land use restrictions were adopted, *State National Bank v. Zoning Board of Appeals,* 81 Ill.App.3d 105, 400 N.E.2d 433, 36 Ill.Dec. 13 (1st Dist.1979). Perhaps the restraints should be strictly construed to apply only if the proposed development had been completed, as restraints are not favored, *Postal Telegraph–Cable Co. v. Western Union Telegraph Co.,* 155 Ill. 335, 40 N.E. 587 (1895). Perhaps the City and a subsequent developer could amend either because Illinois law would no longer recognize the extensive vested rights concept urged by plaintiff, or because which homeowners association was supposed to have rights is uncertain, or because the Association was a donee beneficiary. *See Board of Education v. Village of Hoffman Estates,* 126 Ill.App.3d 625, 467 N.E.2d 1064, 81 Ill.Dec. 942 (1st Dist. 1984).

 *Lake Caryonah Improvement Assoc. v. Pulte Home Corp.,* 706 F.Supp. 600, 604–05 (N.D.Ill. 1989).

pays taxes on the land for seven successive years. *Chicago Title & Trust Co. v. Drobnick,* 20 Ill.2d 374, 169 N.E.2d 792 (1960). The dispute between the Association and Pulte is not a dispute between the owner of paramount title and the holder of color of title. Pulte *is* the titleholder. Further, the Association does not purport to hold any kind of title to the Phase I property; rather, it claims that Pulte must convey the property to it pursuant to the SIA. Thus the Association's suit is based upon a claim for breach of contract, and § 13–206, which sets forth a ten year period, is the appropriate limitations period. Because the Association filed suit within a year after Howard and Pulte refused to convey the property, its claim is not barred by the statute of limitations.

 Be that as it may, the Association's claim is still barred by laches. Laches operates as a bar upon the assertion of a party's rights when that party has unreasonably delayed in asserting its rights so as to cause prejudice to the adverse party. *Schroeder v. Schlueter,* 85 Ill.App.3d 574, 407 N.E.2d 204, 41 Ill.Dec. 12 (5th Dist. 1980).

> [Laches] has been aptly referred to as the doctrine of stale demand and is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights under circumstances where he might have earlier asserted such rights in the exercise of due diligence. This lack of diligence must also be reflected in some resulting inequity to the adverse party such that it would be unfair to allow maintenance of the claim, [and] in cases where property is in dispute, because of some change in the condition or relation of the property and the parties.

*Id.,* 407 N.E.2d at 207, 41 Ill.Dec. at 15 (citation omitted). The decision of the trial court to invoke the doctrine of laches will not be disturbed absent a clear abuse of discretion. *Schroeder,* 407 N.E.2d at 206, 41 Ill.Dec. at 140.

We find it hard to imagine a circumstance in which the application of laches would be more justified. The Association's delay in asserting whatever rights it may have had under the SIA is patently unreasonable. Assuming that it is the "homeowners association" contemplated by Paragraph 7, the Association, for which the Articles of Incorporation were filed on June 28, 1976, could have asked for conveyance *anytime* after the SIA was recorded on October 4, 1976. One such opportune time would have been during the late 1970's, when the City was holding public hearings on the proposed ordinance to rezone the LC–PUD to a medium density residential complex, thereby changing the character and intent of the earlier planned development and giving notice to the Association that its alleged rights under the original plan of development might be compromised. Another such opportune time would have been in December of 1980, after Honeybee fell upon hard times and deeded the property to the Bank. Soon thereafter, the Association received the deed to and the release of the Bank's mortgage rights to the "common area" within Phase I. Significantly, the Association did not receive similar documentation with respect to the Phase IA property and, more significantly, the Association did nothing about it. Indeed, when some members of the Association received a Phase IA tax bill in 1980, they forwarded the bill to Honeybee.

Although it could have sought conveyance anytime after 1976, the Association did not. Until 1987, it was content to let the developer and its successors-in-interest pay for the upkeep of the property, carry liability and title insurance on the property, and pay taxes on the property. The Association did not awake from its slumber until Pulte, seeking to realize a profit on the property upon which it (or its predecessors-in-interest) had paid taxes and upkeep for eleven years, set in motion plans for the property's development. Presumably, the Association would have taken a free ride for eleven more years had not Pulte begun development.

 Although we have no doubt that the Association's delay in asserting its "alleged" rights was unreasonable, this delay

also must have caused prejudice to Pulte. Prejudice is established when a party "remains passive while an adverse claimant incurs risk, enters into obligations, or makes expenditures for improvements or taxes." *Pyle v. Ferrell,* 12 Ill.2d 547, 147 N.E.2d 341, 345 (1958). Prejudice also may be established when there is a change in the relationship between the parties, *id.,* or when there is a marked appreciation or depreciation in the value of the property. *Diehl v. Olson,* 141 Ill.App.3d 110, 489 N.E.2d 1184, 95 Ill.Dec. 456 (3rd Dist.1986); *Miller v. Bloomberg,* 126 Ill.App.3d 332, 466 N.E.2d 1342, 81 Ill.Dec. 540 (2nd Dist. 1984); *Schroeder,* 407 N.E.2d 204, 41 Ill. Dec. 12.

There is clear prejudice here. As already noted, Pulte and its predecessors-in-interest have paid taxes on the property at issue, carried insurance on the property, and maintained the property for eleven years before the Association asserted its claim. Furthermore, Pulte entered into a contract to purchase the property which included Phase IA, reasonably believing that there were no outstanding claims on the property. (The City, in fact, advised Pulte that the LC–PUD was void.) Pulte then expended considerable time and money in its efforts to develop the property, only to be stonewalled by the moss-covered claims of the Association.

### III.

The Association is asking too much, too late. Having behaved more like Rip Van Winkle than "the early bird," it now must live with the consequences. Because the Association's unreasonable delay caused prejudice to Pulte, the district court did not abuse its discretion in barring the Association's claim by laches. The decision of the district court is therefore

AFFIRMED.