Roger W. GIESE, Plaintiff,

v.

**PIERCE CHEMICAL COMPANY**
and Vector Laboratories,
Inc., Defendants.

Civil Action No. 97–12561–WGY.

United States District Court,
D. Massachusetts.

Dec. 2, 1998.

**34**

Ian Crawford, J. Owen Todd, Todd & Weld, Boston, MA, for Roger W. Giese.

Peter G. Carroll, Duane C. Blake, Medlen & Carroll, LLP, Cambridge, MA, for Pierce Chemical Co., Vector Laboratories, Inc.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

The plaintiff, Roger W. Giese, commenced suit against the defendants, Vector Laboratories, Inc. ("Vector") and Pierce Chemical Co. ("Pierce"), alleging contributory infringement and inducement of infringement of Giese's patents, United States Letters Patent Nos. Re.31,712 ("the '712 Patent") and B1,4,478,-914 ("the '914 Patent").

The patents cover a method by which multiple layers of chemicals are attached to one another to form a stable system. The resulting system typically is used to improve detection of certain types of cells, for example, cancer cells. Vector manufactures a kit of chemical reagents marketed under the trade name "Vectastain ABC Kit", a product designed to assist in the marking and detection of various types of cells. Pierce purchases the kits for subsequent resale. Giese maintains in his Amended Complaint that the ABC Kits "incorporate the technology dis-

covered by the Plaintiff." Amended Complaint ¶ 9. Giese further alleges that the defendants use "a component of Dr. Giese's patented technology in its ABC Staining Kits which component constitutes a material part of Dr. Giese's invention." Amended Complaint ¶ 15. On the strength of these allegations, Giese contends that both Vector and Pierce have contributed to or have actively induced the direct infringement of the patents. Giese includes no count for direct infringement.

Vector and Pierce come now before this Court with three separate motions for summary judgment. The first seeks partial summary judgment on the ground of non-infringement as to certain end users of the kits. The second is based on the doctrine of laches. The third asserts equitable estoppel. For the sake of clarity, this memorandum will address each motion separately.

## I. NON–INFRINGEMENT

The defendants' first motion for summary judgment asserts non-infringement under the common law experimental use exception to patent infringement. *See Roche Prods., Inc. v. Bolar Pharmaceutical Co.,* 733 F.2d 858 (Fed.Cir.1984). It is undisputed that a substantial portion of the ABC kits are sold to non-profit institutional, educational, and academic researchers. As to this portion of sales, the defendants seek summary judgment that there can be no contributory infringement or active inducement liability. The argument may be stated simply: there can be no contributory infringement or active inducement without direct infringement; there has been no direct infringement because academic researchers under certain circumstances are permitted to engage in activities that would otherwise constitute infringement; therefore there has been no contributory infringement or active inducement.

### A. Facts

The facts underlying this motion are undisputed, but not well developed. The parties agree that a substantial portion of the ABC kits are sold to academic researchers, but there is no agreement on exactly what proportion, and no information at all as to which users fall into that category.[1] It is also undisputed that the sales literature states that the kits are designed to be used for research purposes only.

Further, Vector concedes that some of its sales are to commercial users, and does not seek summary judgment as to those users. Vector also concedes that it sells kits to Pierce, which then resells them. As to those kits, Vector argues that Pierce does not practice the patented methods, and that any infringement must be based on infringement by end users who do practice the patented methods without permission. Vector, invoking the same syllogism it applies to its own direct sales to consumers, argues that only commercial users purchasing from Pierce may infringe.

### B. Analysis

The experimental use exception to the patent infringement provisions of 35 U.S.C. § 271 has its origins in the notion that "it could never have been the intention of the legislature to punish a man, who constructed ... a [patented] machine merely for philosophical experiments ...." *Whittemore v. Cutter,* 29 F. Cas. 1120 (C.C.D.Mass. 1813)(No. 17,600)(Story, J.). In the intervening years, the doctrine has been the subject of considerable discussion but infrequent application. *See* Suzanne T. Michel, *The Experimental Use Exception to Infringement Applied to Federally Funded Inventions,* 7 High Tech. L.J. 369, 371–73 (1992); Ned A. Israelsen, *Making, Using, and Selling Without Infringing: an Examination of 35 U.S.C. Section 271(e) and the Experimental Use Exception to Patent Infringement,* 16 AIPLA Q.J. 457, 458–62 (1989). The most authoritative discussion appears in the Federal Circuit's *Roche* decision. In *Roche,* the court described the exception as "truly nar-

---

1. A list of "some of the more well-known institutions" is appended to the Declaration of James S. Whitehead as Appendix B. The Appendix lists over one hundred institutions, but the record is devoid of evidence concerning each institution's use of the kits. At trial, it would be open to Giese to show that any or all of these institutions engage in direct infringement not protected under the common law exception.

row," excluding from its scope the use of a patented invention " 'in keeping with the legitimate business of the [alleged infringer].' " *Id.*, 733 F.2d at 863 (quoting *Pitcairn v. United States,* 547 F.2d 1106, 1125–26 [Ct.Cl. 1976] ). The court held that the defendant's experimental use was "solely for business reasons and not for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry," *id.*, and thus was not exempted from infringement.

■ *Roche* established a restrictive definition of the traditional common law doctrine, but in no way eliminated it in those cases which involve experimentation for "idle curiosity or for strictly philosophical inquiry." *Id.* Giese does not dispute that the doctrine applies in some instances, yet because the record contains no information about the actual experimental use, this Court need not and cannot decide at this point whether any particular use falls within the exception.

Giese, however, challenges the application of the doctrine on a different ground: that Vector and Pierce profit from the sales of the kits, regardless of whether they are put to use for experimental purposes or for purely commercial purposes. That profit, asserts Giese, deprives Giese of a benefit which derives from the use of his patented processes, and thus should deprive the defendants of the shelter of the experimental use exception.

■ Giese's analysis is flawed, and would allow him to protect rights beyond those conferred upon him by the patents. Both the '712 and the '914 patents are method patents. Infringement of a method patent consists of practicing the claimed methods; the materials used to practice the methods are not themselves protected. In order to prevail on a direct infringement claim, Giese would need to prove either that the kit is

manufactured using the claimed methods, or that he owns a patent covering the material composition of the reagents in the kit. Giese makes no such claims. Indeed, his claims are directed at contributory infringement and inducement, theories based on the encouragement or facilitation of direct infringement by others.

■ Giese's claims in this case therefore must be grounded on allegations of direct infringement by the end-users of the kits. Customers allegedly purchase the kits in order to practice the protected methods because the kits are specially adapted or made for such use. *See* 35 U.S.C. § 271.[2] The only actions of the defendants that could be deemed infringing under these theories are the sales of the kits to infringers. Liability depends, however, upon the direct infringement by third parties. Absent direct infringement, there can be no inducement or contributory infringement. *See Joy Technologies, Inc. v. Flakt, Inc.,* 6 F.3d 770 (Fed.Cir. 1993); *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687 (Fed.Cir. 1986).

■ If the end users are not infringers due to the protection of the experimental use doctrine, then the defendants Vector and Pierce cannot be liable for contributory infringement or inducement. It makes no difference that Vector and Pierce benefit financially by selling the kits because they are selling kits to end-users who have the right to practice the patented methods. *Cf. Met–Coil* 803 F.2d at 687 (sales to persons with implied license to practice patented method did not infringe). Vector and Pierce are entitled to benefit from the use of that which is not patented, and are entitled to benefit by encouraging or facilitating the non-infringing

2. Section 271 provides in relevant part:
 (a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.
 (b) Whoever actively induces infringement of a patent shall be liable as an infringer.
 (c) Whoever offers to sell or sells within the United States or imports into the United States a

component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

use of their products. This Court determines that the experimental use exception, to the extent its elements are otherwise satisfied, shields Vector and Pierce from claims of contributory infringement or inducement.

Having reached that legal conclusion, however, the Court is without the necessary showing to grant summary judgment. Vector and Pierce have made no showing that the end-users, or any of them, fall within the exemption. Although Giese has not made a contrary showing, it is the burden of the moving party to establish the absence of genuine issues of material fact, *see* Fed. R.Civ.P. 56, and the defendants have not done so. As a result, the motion for summary judgment of non-infringement is DENIED.

## II. LACHES

The second motion for summary judgment asserts the equitable defense of laches. Vector and Pierce argue that Giese's delay in asserting his rights under the patents, despite having knowledge of Vector's product for many years, renders it inequitable to allow him to claim damages from the alleged infringement at this late date. Giese asserts that there are various events during the relevant period that should be regarded as excusing his delay.

### A. Facts

The following chronology of relevant events is established by the record.

#### 1. The Patents

U.S. Patent No. 4,282,287 was issued to Giese on August 4, 1981. Upon Vector's suggestion that the patent might be anticipated by prior art, Giese applied for reissuance on May 3, 1982, and again on September 14, 1983. The '827 patent was reissued on October 23, 1984, over the formal protest of Vector,[3] as U.S. Patent No. Re. 31,712, one of the patents now in suit.

A continuation of the '287 patent, U.S. Patent No. 4,478,914, was also issued on October 23, 1984. The '914 patent was later subject to reexamination following the suggestion of a third party that there may have been another prior art reference; the Reexamination Certificate issued under No. B1 4,478,914 on June 17, 1997. The '914 patent is also one of the patents now in suit.

#### 2. The Parties

On August 11, 1981, Giese's counsel wrote to Vector's president to notify Vector that its ABC kits might infringe on Giese's (then) '287 patent. An exchange of correspondence followed between the two principals and their counsel, to the effect that Giese offered a licensing agreement, but that Vector denied infringement and suggested the anticipation of the patent by prior art. That exchange concluded on December 21, 1981.

On July 7, 1982, Giese advised Vector through counsel that a reissue application had been filed, and invited Vector to participate in the proceedings. Vector did file a formal protest with the Patent and Trademark Office.

The next direct communication between the parties occurred on December 31, 1991, when Giese again informed Vector through counsel that he considered Vector's products potentially infringing, and again invited negotiations concerning a licensing agreement. On January 14, 1992, Vector responded that it was reviewing the patents and its products. Vector never notified Giese of the results of that review.[4] On July 18, 1997, Giese invited Vector to discuss a license of the now reexamined '914 patent. Vector replied again that its kits did not infringe on the patent. At no time did Vector identify to Giese any prejudice it had suffered as a result of Giese's delay.

#### 3. The Licensing Agreements

As a result of the reissue proceeding, Giese was without resources to pursue poten-

---

3. Although Vector had notice of the first application, and participated in the proceedings, Giese did not notify Vector of the superceding application or of the reissuance.

4. Vector did, however, enter into a licensing agreement covering another patent, U.S. Patent No. 4,656,252, in settlement of an infringement suit filed by Giese.

tial infringers between May 1982 and October 1984. On April 25, 1985, Giese entered into an exclusive licensing agreement with Beckman Instruments, Inc. During the term of the agreement, Beckman had the sole right to bring actions for the enforcement of the patents. That agreement terminated in February 1991. Between 1991 and 1992, Giese approached a number of other companies to explore licensing arrangements, and engaged in negotiations with several. Giese ultimately entered into an agreement with Boehringer Mannheim for a non-exclusive license in October 1994.

## B. Analysis

### 1. Applicable Law

■■■ Unreasonable and inexcusable delay in filing suit to enforce a patent that causes material prejudice to the alleged infringer gives rise to a defense of laches. *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1028 (Fed.Cir.1992). The defense is equitable in nature and committed to the sound discretion of the trial judge. *See Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.1998). The quantum of proof required to establish laches is a preponderance of the evidence. *See Aukerman,* 960 F.2d at 1045. Where laches is established, the patent holder's claim for damages prior to suit may be barred, but post-filing damages and injunctive relief may still be available absent egregious circumstances. *See Aukerman,* 960 F.2d at 1040; *Menendez v. Holt,* 128 U.S. 514, 523–24, 9 S.Ct. 143, 32 L.Ed. 526 (1888). Such egregious conduct is said to distinguish the defense of laches from that of equitable estoppel, which may result in the denial of all relief. *See Aukerman,* 960 F.2d at 1041; *George J. Meyer Mfg. v. Miller Mfg.,* 24 F.2d 505, 507 (7th Cir.1928).

Application of the defense of laches must be flexible, and depends on all of the circumstances of the particular case and the equities involved. The Federal Circuit, however, has articulated a set of factors that the defendant invoking laches must prove: First, that "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant." Second, that "the delay operated to the prejudice or injury of the defendant." *Aukerman,* 960 F.2d at 1032.

■■■ Prejudice to the defendant may be either economic or evidentiary. Economic prejudice consists of damages or the loss of monetary investments which likely would have been prevented by earlier suit. *See id.* at 1033. Ordinarily, such prejudice results from a change in the position of the defendant during the period of delay. *See Lake Caryonah Improvement Assn. v. Pulte Home Corp.,* 903 F.2d 505, 510 (7th Cir.1990). In any event, the economic loss must be more than that attributable to a finding of infringement. *See Jenn–Air Corp. v. Penn Ventilator Co.* 464 F.2d 48, 49–50 (3rd Cir.1972). Evidentiary prejudice consists of harm to the defendant's ability to present a full and fair defense on the merits by reason of loss of records, the death of witnesses, or the fading of memories. *See Aukerman,* 960 F.2d at 1033.

■■■ A court must also consider any justification offered by the plaintiff for its delay. Among the excuses that have been recognized in some instances are: other litigation, negotiations with the accused, poverty and illness under limited circumstances, war, minimal infringement, egregious behavior by the accused, and dispute over ownership of the patent. *See id.* and cases there cited.

■■■ There is no statute of limitations in patent infringement actions, but there is a six-year damage limitation period. 35 U.S.C. § 286 (damages limited to infringement during the six year period preceding the filing of suit). Courts have borrowed this period to serve as the period giving rise to a rebuttable presumption of laches. If a patent holder delays more than six years in bringing suit after learning of the infringement, the presumption creates a prima facie defense of laches. *See id.* at 1034–37. The period may not begin, however, before the issuance of the patent. *See id.* at 1032; *Watkins v. Northwestern Ohio Tractor Pullers Assn., Inc.,* 630 F.2d 1155, 1161 (6th Cir.1980).

The presumption operates to establish the elements of unreasonableness and prejudice,

absent rebuttal. *See Aukerman,* 960 F.2d at 1037. Of course, the recognition of the defense is not thereby made mandatory by the presumption. The presumption only serves to establish the existence of the two necessary elements. *See id.* at 1035–36. Moreover, the defendant bears the ultimate burden of persuasion. *See id.* at 1038. A plaintiff may eliminate the presumption by offering evidence sufficient to create a genuine issue, even if it would not ultimately be persuasive, that the delay was reasonable or excusable, or that the defendant was not prejudiced. Evidence sufficient to rebut either element is sufficient to burst the presumption, *see Hemstreet v. Computer Entry Sys. Corp.,* 972 F.2d 1290, 1293 (Fed.Cir. 1992), and force the defendant to establish both elements by means of "actual evidence," *Aukerman,* 960 F.2d at 1038. In the alternative, the plaintiff may preclude application of the laches defense (leaving the presumption intact) by proving by a preponderance of the evidence that the defendant was guilty of misdeeds that render the defense inequitable.

### 2. Giese's Delay Gives Rise to the Presumption

Giese filed this action on November 17, 1997. It is undisputed that Giese knew of Vector's potential infringement on the original '287 patent by August 11, 1981, when he so informed Vector through counsel. But the '712 and '914 patents on which Giese bases his claims were not issued until October 24, 1984. Thus, the period of laches with respect to Vector began on October 24, 1984.

Vector entered into its agreement with Pierce on May 23, 1989. Giese's claim against Pierce arose no earlier than that date, because there is no indication that Pierce sold ABC kits before entering into the agreement. Thus, the period of laches with respect to Pierce began on May 23, 1989.

Both parties have therefore established that Giese delayed more than six years after learning of their potential infringement before filing suit. The burden thus shifts to Giese to produce evidence that its delay was reasonable or excusable, or that Vector and Pierce were not thereby prejudiced.

### 3. Rebuttal

#### a. Prejudice

Giese introduces no evidence on the subject of prejudice, either to show that evidence of Vector's and Pierce's defenses remains available substantially as before the delay, or that Vector and Pierce have not suffered economic prejudice. Giese does question the validity and credibility of the defendants' assertions of prejudice, but nothing in the record supplies the "minimum quantum of evidence" necessary to burst the presumption. *Aukerman,* 960 F.2d at 1037; *cf. Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254–55, n. 8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); Fed.R.Civ.P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of his pleading but ... must set forth specific facts showing that there is a genuine issue for trial"). For example, in *Northern Telecom, Inc. v. Datapoint Corp.,* Civ. A. No. CA3–82–1039–D, 1992 WL 210249, at *3 (N.D. Tex. June 4, 1992), the court held that the presumption was eliminated by a showing that all relevant documents and evidence that the defendant might need were preserved and made available to the defendant as a result of another litigation ongoing during the delay.

Giese merely points to weaknesses in the defendants' affirmative proof. "Such an attack is, of course, unavailing, inasmuch as the defendants could have remained utterly mute on the issue of prejudice and nonetheless prevailed." *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1554 (Fed.Cir.1996). Giese has "failed to come forward with any evidence demonstrating a lack of prejudice as to any of the defendants, and thus failed to 'burst' the Aukerman presumption 'bubble' with a 'no prejudice' lance." *Id.*

#### b. Unreasonable Delay

Giese does, however, come forward with evidence pertaining to the reasonableness of his delay. Giese advances three factors in support of his position: 1) other litigation concerning the patents before the Patent and Trademark Office; 2) licensing negotiations with the defendants and others; and 3) reex-

amination of the '914 patent. The court must determine whether any of these factors are legally cognizable excuses for Giese's delay, and if so whether they are properly supported in the record.

### i. Other Litigation

First, Giese argues that his delay is excused by the reissue and reexamination proceedings because those proceedings constitute "other litigation" in the sense recognized in *Aukerman*. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 876–77 (Fed.Cir.1991). In order for such litigation to excuse an otherwise unreasonable delay, decisions prior to *Aukerman* had held that the defendant must have had notice of the litigation and of the plaintiff's intention to enforce his patent rights upon completion. *See, e.g., Jamesbury Corp. v. Litton*, 839 F.2d 1544, 1552–53 (Fed.Cir. 1988), *overruled by Aukerman*, 960 F.2d at 1038; *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573 (Fed.Cir.1987), *overruled by Aukerman*, 960 F.2d at 1038. *Aukerman*, however, "restores equitable flexibility: 'The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant.'" *Hemstreet*, 972 F.2d at 1293 (quoting *Aukerman*, 960 F.2d at 1033).

The reissue proceedings spanned the period from May 3, 1982 to October 23, 1984; the reexamination proceedings spanned the period from May 1995 to June 17, 1997. As to the first of those periods, this memorandum has concluded that laches did not begin to run until the October 1984 reissuance. The pre–1984 period is therefore irrelevant. As to the 1995–1997 proceedings, whatever tolling effect they may have began over ten years into the laches period. Even if the reexamination proceedings provide a legally cognizable excuse for the two years during which they were pending, they have no bearing on the preceding decade of delay. Thus, even though Giese comes forward with affirmative evidence, that evidence does not materially disturb the presumption of unreasonable delay.

### ii. Negotiations

Giese next contends that the period of delay from 1991 until 1994 is excusable on the basis of negotiations between Giese and a number of other companies concerning the possibility of licensing his technology. The reason for such tolling is that a plaintiff's continuous and bilaterally progressing efforts to resolve the patent dispute justify delay in bringing suit. *See General Elec. Co. v. Sciaky Bros.*, 304 F.2d 724, 727 (6th Cir. 1962); *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1377–78 (7th Cir.1972).

Giese contends that the Court must consider negotiations with all other parties, in addition to the defendants, in considering this rebuttal evidence. Giese cites *Meyers v. Asics Corp.*, 974 F.2d 1304 (Fed.Cir.1992). In that case, the Court held that the plaintiff's delay was not unreasonable citing evidence of, among other things, "negotiating with other parties for licenses." *See also Lemelson v. Wang Labs., Inc.*, 874 F.Supp. 430, 435 (D.Mass.1994) (Stearns, J.) (citing *Meyers* with approval). Both of these cases, however, involve negotiation between the plaintiff and the defendant in the case. *See In re Stuart R. Meyers Patent Litigation*, 731 F.Supp. 640, 641–42 (S.D.N.Y.1990) *rev'd sub nom Meyers*, 974 F.2d 1304 (Fed.Cir.1992); *Lemelson*, 874 F.Supp. at 434–35 (plaintiff also involved in litigation with third parties during the entire period of laches). There is nothing in either case to support the proposition that negotiations with parties other than the defendants excuse delay in bringing suit against the defendants.

 Moreover, such treatment is inconsistent with the rationale behind the rule. The fact that Giese was negotiating with Boehringer Mannheim for the non-exclusive licensing of his technology has no bearing on his dispute with Vector and Pierce over their potential infringement. Nor does it alter the equities involved in Giese's delay in bringing this suit. Third party negotiations simply do not represent an attempt to resolve the dispute with the defendants short of litigation— the main justification for tolling during negotiations. A comparison of the negotiation justification with the litigation justification is instructive. "Courts have generally held that a patentee need not sue more than one infringer at a given time. Any delay due to

involvement in other litigation is considered excusable and hence not chargeable to the patentee as unreasonable delay." *Watkins v. Northwestern Ohio Tractor Pullers Assn., Inc.,* 630 F.2d 1155, 1162 (6th Cir.1980). In the case of litigation, courts consider the practical limitations on the ability of plaintiffs to pursue multiple concurrent lawsuits. The defendant asserting laches is in effect told that he must wait until the diligent plaintiff has a chance to come after him. In the case of negotiation, no such rationale applies; there is no compelling reason to release a plaintiff from his duty to protect his patent by reason of his efforts to reap the rewards of his monopoly. The Court therefore focuses its attention on the character of the communications between Giese and Vector.

Giese does not argue that it was conducting negotiations with Vector during the relevant period. Indeed, the record reflects a series of rebuffed offers to negotiate. Vector consistently denied infringement over the course of the parties' sporadic contacts, and nothing in the record indicates any bilateral negotiation or progress toward settling the dispute.

### iii. Awaiting Related Patent

Third, Giese argues that he was not required to file suit for infringement of the '712 patent before the reexamination of the '914 patent was complete, citing *Meyers v. Brooks Shoe, Inc.,* 912 F.2d 1459, 1462 (Fed.Cir. 1990). Meyers involved a group of related patents which issued at different times. The court held that the patent holder permissibly could wait until the second patent had issued before bringing suit on the first. The court justified the outcome on the basis of judicial economy. *See id.*

This case is distinguishable from *Meyers* in at least two material respects. In this case, both patents had been issued for years when the reexamination application was filed. Giese does not suggest that he could not have sued on the '914 patent before its reexamination, nor does he provide any authority so holding. In contrast, the patent holder in *Meyers* was constrained to wait on the later issued patent because he had no rights to enforce it prior to issuance. For related reasons, the parties in *Meyers* occupied a different position with respect to the laches presumption. Not only had the plaintiff in *Meyers* delayed for less than six years, but the period of laches cannot begin until the issuance of the patent. *See Aukerman,* 960 F.2d at 1032. There the patents had issued 5½ years, 4 years, and 1½ years, respectively, prior to the time of suit. Here, Giese's patents issued more than 13 years before his filing suit, and the reexamination did not begin until over ten years after issuance. As earlier noted, the intervening delay in suing on the '914 patent could not have been caused by the reexamination proceeding. It follows that the delay in suing on the '712 patent could not be attributable to the reexamination proceeding either.

In reaching the conclusion that there is no triable issue of fact as to the reasonableness of Giese's delay, the Court relies on a particular understanding of the laches presumption that bears explicit articulation. Stated plainly, this understanding is that evidence of reasonable excuse for delay is not material, even if otherwise legally cognizable, if a continuous six year period of delay remains unexplained. The alternative understanding would be that legally cognizable evidence of reasonable excuse would always eliminate the presumption, regardless of the period of unexplained delay remaining. Although no court has addressed this specific problem, the former view is more persuasive. An excuse that leaves a presumptively unreasonable period of delay unaccounted for does not create a genuine issue of material fact as to the reasonableness of the entire delay. The Court therefore concludes that evidence of the reexamination of the '914 patent does not create a genuine basis for disputing that Giese's delay in bringing suit was unreasonable.

### iv. Other excuses

In passing, and without argument, Giese also states that he was at various times without resources to pursue legal action against Vector and Pierce, or that he was contractually precluded from doing so. Neither matter has been recognized as a legal excuse for delay. *See Leggett v. Standard Oil Co.,* 149

U.S. 287, 294, 13 S.Ct. 902, 37 L.Ed. 737 (1893) (poverty alone does not excuse delay); *Aqua Queen,* 93 F.3d at 1554 (same); *cf. Valutron N.V. v. NCR Corp.,* 1992 WL 698780, 33 U.S.P.Q.2d 1986, 1988–89 (S.D.Ohio 1992) (laches of patentee applicable to efforts by assignee to enforce patent), *aff'd without opinion,* 5 F.3d 1506 (Fed.Cir.1993).

Because Giese has not offered evidence sufficient to create a genuine issue of material fact as to the reasonableness of its delay or the prejudice to the defendants, he has failed to dissipate the presumption. The Court is therefore required to infer from the six year delay both unreasonableness and prejudice to the defendants.

### 4. Inequitable Conduct of Defendant

Giese offers no evidence or argument that Vector or Pierce have engaged in misdeeds that would alter the balance of the equities. An example of such behavior is intentional infringement or conscious copying of the patented process, whereas a good faith belief in non-infringement would tilt the equities toward the defense. *See Aukerman,* 960 F.2d at 1033. The Court need not consider this element of the analysis, as there is no reference in the record to any behavior to which it might apply.

### 5. Equitable Discretion

The establishment of the presumption of laches does not end the inquiry. "With its origins in equity, a determination of laches is not made upon the application of 'mechanical rules.' " *Aukerman,* 960 F.2d at 1032 (quoting *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 [1946] ). Regarding the elements of unreasonable delay and prejudice to the defendants as established, the Court must go on to consider the "length of delay, the seriousness of the prejudice, the reasonability of excuses, and the defendant's conduct or culpability." *Id.* at 1034. "In sum, a district court must weigh all pertinent facts and equities in making a decision on the laches defense." *Id.*

■ Considering the unexplained delay of over ten years, the repeated charges of infringement and repeatedly rejected licensure overtures, and the absence of any demonstrated culpable behavior by the defendants, this Court concludes that Vector and Pierce have satisfied their burden of persuasion, and that Giese is barred by the doctrine of laches from bringing suit for damages incurred during the period of his delay. The motion for summary judgment of laches is therefore GRANTED.

### III. EQUITABLE ESTOPPEL

■ The defendants' third motion for summary judgment is based on the theory of equitable estoppel. This defense is closely related to laches, but differs in important respects. As a practical matter, estoppel may bar all relief, including injunctive relief, while laches only bars pre-filing damages. See *Aukerman* 960 F.2d at 1040–1041. As an evidentiary matter, the elements of equitable estoppel diverge as well, and focus more directly on communication between the patent holder and the accused infringer, rather than on the dilatory conduct of the patent holder. The elements are: 1) misleading communication by the patent holder; 2) reliance on the misleading communication by the accused infringer; and 3) material harm to the accused infringer if the patent holder is later allowed to assert any claim inconsistent with his earlier conduct. *See Aukerman,* 960 F.2d at 1041–1043.

The first element, misleading communication, may be nothing more than misleading inaction. *See id.* at 1042. Such inaction, however, must be combined with "other facts respecting the relationship or contacts between he parties to five rise to the necessary inference that the claim against the defendant is abandoned." *Id.*

The second element, reliance, is not an element of laches (although the prejudice element of laches may involve similar factual circumstances) yet it is essential to estoppel. Prejudice may be shown without reliance, as where an infringer, unaware of the patent he is violating, builds a factory to manufacture a protected article. In this example, in order to show reliance, the defendant must show, in addition to prejudice, that he was lulled into building the factory by some aspect of the

relationship or communication with the patent holder. *See id.* at 1042–43.

The third element, material prejudice, is established with the same evidence used in the laches context, and may involve either economic or evidentiary prejudice. *See id.*

Most importantly, there is no presumption involved in the equitable estoppel context. The defendant must prove each element using competent evidence.

In this case, Vector and Pierce rely heavily on the laches presumption to establish their estoppel defense. When put to their proof, however, they offer the following evidence of detrimental reliance. The defendants submit that there was a seven year period of complete silence between the parties between October 1984 and December 1991. That silence was broken by a letter informing Vector that its products appeared to infringe on the '914, '712, and a third related patent. In July 1995, Giese sued Vector for infringement of the third patent, but not for infringement of either the '914 or the '712 patent. Vector and Pierce argue that the failure to include the '914 or the '712 patents in the suit persuaded them that there was no further dispute with respect to those patents.

Giese presents the episode in a different light. Vector and Giese entered into a nonexclusive licensing agreement covering the third patent, as part of a settlement of the 1995 litigation. *See* Declaration of Giese ¶ 24, Ex. 9. That agreement specifically excludes the '914 and '712 patents from its coverage, and extends only to certain Vector products not involved in this suit. *See id.* The agreement further provides an admission that those particular products do not infringe any other patents Giese holds, "excepting only the Patent Rights that are the subject of this agreement and that such products may be used in such a manner so as to infringe such other patents." Giese submits that this agreement indicates an explicit reservation of rights under the '914 and '712 patents, and a refusal to authorize Vector to practice the methods covered by those patents.

██ Giese would have the Court infer that Vector could not have relied on his behavior or representations to conclude that the '914 and '712 patents would not be enforced, because in the course of dealings his dealings with Vector he expressly reserved that option. Vector would have the Court infer that Giese acted to enforce patents when it chose to, and abandoned those patents it did not chose to enforce. It would be as permissible for the finder of fact to credit Giese's inference, as it would be to credit Vector's. Either inference is supportable on the record presented. In order for the Court to draw an unfavorable inference against Giese, however, the inference "must be the *only* possible inference from the evidence," *Aukerman*, 960 F.2d at 1044 (emphasis in original). As there is a genuine issue over the inference of reliance, summary judgment of estoppel is inappropriate, and the motion must be DENIED.

## IV. CONCLUSION

The Court confronts three separate motions for partial summary judgment. On the first motion, for partial summary judgment of non-infringement, the Court concludes that sales of ABC kits for uses that are protected under the common law experimental use doctrine cannot constitute either contributory infringement or active inducement of infringement, because there is no direct infringement. Vector and Giese, however, have not succeeded in demonstrating the applicability of the experimental use exception to any particular customer or customers. Therefore, the motion of Vector and Giese for partial summary judgment of non-infringement is DENIED.

On the second motion, for summary judgment of laches, the Court concludes that Vector and Pierce have established at least a six year delay between Giese's discovery of the alleged infringement and the filing of suit, thus giving rise to a presumption of laches. Furthermore, the Court concludes that Giese has failed to produce evidence sufficient to rebut that presumption, and therefore infers the elements of unreasonable delay and prejudice to the defendants. Based on those factors, the absence of inequitable conduct on the part of Vector and Pierce, and all the pertinent facts and equi-

ties, the Court holds that Giese is barred from maintaining an action for the recovery of damages incurred during the period of his unreasonable delay. The motion of Vector and Pierce for summary judgment of laches is therefore GRANTED.

On the third motion, for summary judgment of equitable estoppel, the Court concludes that Giese has established the existence of a genuine issue of material fact as to the element of reliance. The motion of Vector and Pierce for summary judgment of equitable estoppel is therefore DENIED.